[No. S018634. Aug. 15, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
ISAAC GUTIERREZ, JR., Defendant and Appellant.

**COUNSEL**

Paul M. Posner, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Holly D. Wilkins, Esteban Hernandez and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—A jury convicted defendant Isaac Gutierrez, Jr., of the first degree murders of Billie Faye Jones and John Stopher (Pen. Code, § 187),[1] first degree residential burglary (§§ 459, 460, subd. (a)), kidnapping of Rose V. (§ 207, subd. (a)), aiding and abetting the forcible rape of Rose V. (§ 261, subd. (a)(2)), and the attempted murder of Police Officer David Dunavent (§§ 664, 187). Multiple-murder and lying-in-wait special circumstances (§ 190.2, subd. (a)(3) and (15)) were found true; the latter in connection with the murder of Stopher. The jury further found that defendant personally used a deadly weapon in the murders of Jones (garrote) and Stopher (shotgun), the kidnapping and forcible rape of Rose V. (shotgun), and the attempted murder of Officer Dunavent (handgun). (§ 12022, subd. (b).) After a penalty trial the jury returned a verdict of death. The trial court denied the automatic motion

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

to modify the penalty (§ 190.4, subd. (e)) and imposed the death sentence.[2] This appeal is automatic. (§ 1239.)

Finding no prejudicial error, we affirm the convictions and judgment of death in their entirety.

## I. FACTS

### A. *Guilt Phase*

#### 1. *Prosecution evidence*

In August 1984, defendant was convicted in Kern County of assault with a deadly weapon (vehicle) on a peace officer and sentenced to state prison for four years. At that time he was married to Rose V., his second wife, and they had a five-year-old daughter. They owned a house located on Montrose Street in Hesperia.

In June 1985, while defendant was in prison, Rose V. met John Stopher, who soon moved in with her at the Montrose Street house. Stopher, age 25, was a female who had been receiving large amounts of testosterone since age 18. Stopher had a full-face dark beard, no breast development, and female genitalia. In November or December 1985, Rose V. advised defendant that she was living with her boyfriend, i.e., Stopher, and that she was going to divorce him. Defendant was angry, told Rose V. he was going to kill Stopher, and wrote her a letter memorializing his threats. Rose V. filed for dissolution of marriage in April 1986.

In August 1986, defendant was released from prison on parole. In October 1986, he moved into the Bakersfield home of his sister and his brother-in-law, Henry Lostaunau, a former police officer. While in prison, defendant had communicated with Billie Faye Jones, a 41-year-old single mother who worked as a medical clerk at Kern County General Hospital and lived with her mother and two sons. On October 30, 1986, Jones told her mother she was having dinner with defendant that evening and would also be seeing him again the following day, which was Halloween. On the morning of October 31, Jones drove her six-year-old son to school, returned home, left again in her van around 1:00 p.m. to run some errands, and never returned.

At approximately 3:00 p.m. on the afternoon of October 31, defendant told Lostaunau he was going to Montgomery Ward and would need a ride home.

---

[2] Defendant also received an aggregate determinate state prison term of 25 years for the remaining convictions.

Lostaunau went to pick up defendant at the arranged location, waited for over an hour, then returned home alone. Defendant testified the plan was a ruse to get Lostaunau out of the house so that he could take firearms, which were kept in the home, without Lostaunau's knowledge.

Defendant has a son, Joseph, from his first marriage, who was 15 years old at the time in question. On the afternoon of October 31, defendant picked up Joseph at the Greyhound bus station in Billie Faye Jones's van. Defendant testified he forced Joseph to accompany him. They stopped briefly at the Lostaunau home to pick up guns and then drove to Hesperia, defendant telling Joseph he had "a little something to take care of" concerning his wife, Rose V. They arrived at the house on Montrose Street, drove past it more than once, then parked on a street atop a nearby hill and waited for Rose V. and Stopher to return home. Around 9:00 to 9:30 p.m., a member of the Hesperia Fire Department approached defendant and Joseph, who were seated in the parked van, questioned them briefly regarding a report of children setting off firecrackers in the area, then departed. Shortly thereafter Rose V. and Stopher returned home. Stopher went to take a shower in the master bathroom.

Defendant and Joseph put on Halloween costumes consisting of rubber masks and capes that defendant had brought along. Defendant put a .380 automatic pistol and a derringer in his jacket pockets, both of which he had taken from Lostaunau's residence, and also concealed a shotgun under his cape.

According to defendant's testimony,[3] before he parked Jones's van outside Rose V.'s house he had not told Joseph what his intentions were regarding his planned contact with V. and Stopher. Defendant testified he threatened Joseph with a gun and ordered him to enter the home and assist him with whatever he was going to do inside. Joseph told defendant, "Dad, I don't want to do this. I don't want to be involved in it." Defendant struck Joseph in the head when he at first refused to enter the house.

Rose V. testified that when she answered the doorbell defendant and Joseph shoved open the door and pushed her to the floor. Defendant's mask flew off. Rose V. thought defendant had a "rifle," although she testified she did not know the difference between a rifle and a shotgun. Joseph, wearing a Halloween mask, placed a handgun to Rose V.'s head. When Rose V. screamed to warn Stopher, she was ordered to shut up. Joseph stayed in the

---

[3]Portions of defendant's testimony from Joseph's juvenile court hearing on charges stemming from these crimes were read into the record at defendant's trial. Defendant was called as a witness by the minor at those proceedings.

living room watching Rose V. with the handgun while defendant forced his way through the locked door of the bathroom and fatally shot Stopher with the 12-gauge shotgun. Expert medical testimony established that Stopher was killed by a shotgun blast to the face and head that left brain tissue spattered about the shower stall. Defendant fired four or five additional shotgun blasts into Stopher's chest, abdomen and left arm.

Defendant and Joseph dragged Rose V. out of the house and forced her into Jones's van, hitting her in the head with a gun. Defendant told Rose V., "your boyfriend back there, he's gone; we blew him away." Defendant drove south toward the freeway while Joseph held a gun to Rose V.'s head. Defendant told her to shut up and threatened that Joseph would cut her if she did not cooperate. At defendant's direction Joseph took some ropes, tied Rose V.'s hands behind her back, tied her ankles, blindfolded, and gagged her.

Defendant drove south on Interstate 15 toward San Bernardino. Although Rose V. knew Joseph, she did not realize he was the assailant accompanying defendant; at first he was wearing a Halloween mask, and thereafter she was blindfolded. Using a knife, Joseph cut off her bra. When he was unable to remove her pants, he cut the rope that was tying her, slicing a half-inch cut in her ankle. Joseph proceeded to rape Rose V. When Joseph was finished, defendant told him to make sure Rose V. could breathe and to keep her covered with a sheet.

Nearing Coachella, defendant got off the freeway and stopped for gas. Joseph took a gas can from the rear of the van and passed it out to defendant; as it was being placed back in the van some of the gas dripped on Rose V.'s face. During the stop Rose V. also felt a finger being inserted into her vagina. She was unable to tell who did this to her. Defendant drove away from the gas station and was stopped by police a short time thereafter.

Coachella Police Officer David Dunavent testified that shortly after midnight on November 1, 1986, he stopped defendant for driving with a headlight out. Defendant got out of the van and spoke with the officer at the rear of the vehicle. He could not produce his driver's license or registration. Officer Dunavent looked into a bubble window on the side of the van and saw someone looking out at him. At that moment defendant placed a handgun to the back of Officer Dunavent's neck. Officer Dunavent heard a click, which he recognized as the sound of a gun dry firing on an empty chamber. The officer turned and ordered defendant to halt or freeze and to drop the weapon. Defendant fired a round at Officer Dunavent and a gun battle ensued. The officer managed to radio for a backup while taking cover

behind the patrol unit. At one point Joseph exited from the van wielding a rifle or shotgun. Ultimately, defendant was wounded by two bullets; neither Officer Dunavent nor Joseph was hit during the exchange of gunfire. Other police officers arrived and arrested defendant and his son.

Inside the van, Rose V. managed to free her hands, remove the gag and call out to the police for help. Police recovered three weapons from the ground in the area of Jones's van. The 12-gauge shotgun and Lostaunau's .380 automatic pistol were near the front of the van; Lostaunau's derringer was found at the rear of the vehicle.

During the early morning hours of November 1, 1986, defendant was contacted by Coachella Police Detective Pete Yanez in the X-ray room of John F. Kennedy Memorial Hospital. Defendant greeted Detective Yanez, whom he knew when he (defendant) had worked as a fireman at the Mecca fire station and Yanez was a Riverside deputy sheriff. Yanez, who was in civilian clothes, told defendant he was a police officer and was there to administer a gun residue kit. Defendant stated to Yanez, "Oh, God. Oh, God. I didn't mean to kill both of them. Oh, what did I do? Did I kill them? Tell the officer I'm sorry. Tell him I'm sorry." Detective Yanez, who was investigating the officer-related shooting, was not aware of defendant's involvement in any murders.

Following the arrest of defendant and his son, and the rescue of Rose V., Coachella police officers made a cursory search of the interior of Jones's van. Possession of the vehicle was transferred to the San Bernardino County Sheriff's Department, and it was towed to their storage facility in San Bernardino. Two days later, on November 3, 1986, Detective Gary Stroup went to the storage facility after receiving information that Jones was the owner of the van and that she was missing. As he approached the door to the storage unit, Detective Stroup smelled a strong odor of decomposing flesh. Reddish brown body fluids were seeping from the van, forming a puddle underneath the vehicle. Detective Stroup entered the van, and after removing a footlocker and a duffel bag, found Jones's body wrapped in a rug on the rear bench seat.

Jones had been strangled with a ligature garrote that was still wrapped around her neck. Her body was in an advanced state of decomposition. The wooden handles of the garrote were behind Jones's neck, indicating she was strangled from behind. She had been killed sometime in the afternoon or early evening of October 31, 1986.

The ends of the garrote were made of wooden doweling. A criminalist compared the garrote handles to pieces of doweling found in Lostaunau's

Bakersfield residence where defendant had been staying, and it was determined they had come from the same piece of wood.

A full search of the van pursuant to warrant was conducted on the night of November 3, 1986. A Remington 308 rifle was recovered from under the seat where Jones's body was found. Also recovered from the van were a package of .380 ammunition, a package of 308 Winchester ammunition, and a package of Winchester 12-gauge shotgun shells. A manila envelope containing notes was found in a suitcase inside the van. On the back of the envelope were numerous notations, one of which included the words "make garrote." V. identified the handwriting as that of defendant.[4] The notes also included the following entries: "Mon. call Rose, Wed. gather all necessities, lic. plates off comm van, wig spook/Halloween store, wig shop, call/Billy dinner, make garrote. Friday rendezvous w/J 1300 Greyhound." Defendant also wrote the following: "Deadlines: Call Billy 3:00, J- 5:00, ETA 5 PM Get to VV, *Call Don Oakes for closing time, carpet . . . gas cans . . . shovels."

### 2. *Defense*

Defendant denied killing Billie Faye Jones. He claimed he found her in her van on the afternoon of October 31, 1986, already dead with the garrote tied around her neck. He admitted killing Stopher with a shotgun; his defense to the murder was that he became enraged when he confirmed his suspicions that John Stopher was a female. Defendant further claimed he was intoxicated, had brain damage, and acted in accordance with a Hispanic code of conduct that required him to protect females in his family. He repudiated his earlier incriminating testimony at Joseph's juvenile court hearing, claiming he lied in that proceeding to protect his son.

Defendant testified in his own behalf. In 1983, he was fired for a second time from his long-standing job as a fireman with the State Department of Forestry as a result of his drinking problems. In 1984, during a stop for drunk driving, defendant sought to evade arrest and led officers on a high-speed chase. He was convicted by guilty plea of assault with a deadly weapon (vehicle) on a peace officer and sentenced to four years in prison.

While in prison, defendant received a letter from Rose V. telling him she was considering a divorce. He testified he felt it was "like the end of my life." Thereafter, defendant was served with a summons for dissolution of marriage and a restraining order. He was ordered to stay away from the

---

[4]At the juvenile proceeding against Joseph, defendant admitted he wrote the three pages of notes in the manila envelope seized from Jones's van.

Montrose Street residence and was prohibited from visiting his wife or daughter. While in prison he telephoned home once and a male voice answered; it was then that defendant learned someone else was living with his wife and daughter. Defendant became very hostile during the call, both he and Stopher threatening one another with harm.

Defendant was released from prison nine months later, in August 1986. He claimed Stopher threatened him and warned, "You come around my house, I'll blow your fucking head off." Defendant believed he was talking to a man. Stopher refused him permission to visit his daughter and told him they did not want him calling anymore. Stopher also said he had a shotgun and if defendant came to the house, he would use the weapon on defendant. Defendant testified that as of October 1986, he felt tormented, confused, angry, and admittedly began harboring feelings of violence toward Stopher. He decided to go to Hesperia to find out about Stopher and to talk to his daughter. One week before he made the trip, he became outraged after speaking with his daughter, who indicated Stopher wanted her to call him "Dad." He came up with a plan to confront Stopher, fully aware that his planned actions would violate the terms of his parole and the restraining order.

Defendant testified that he had had a relationship with Billy Faye Jones before he went to prison, and had corresponded with her from prison on a regular basis. Shortly before the trip to Hesperia he told Jones he was leaving Bakersfield and she agreed to take him and his belongings to Victorville, where he claimed he had a truck at his sister's house. He testified Jones owed a large amount of money for drugs and was afraid for her life. He claimed she asked him to protect her when she met with one of her drug dealers on October 30 at the Rancho Bakersfield Motel to try to purchase a large amount of cocaine. She was afraid because they had threatened her before.

Defendant claimed he took a .380 automatic handgun and a 12-gauge shotgun from his brother-in-law Lostaunau's home, where he was staying, in order to protect Jones. He testified Jones purchased the ammunition for the weapons. On the night of October 30, he and Jones went to a motel in Bakersfield to meet her drug dealer. He gave Jones $500 for use in the transaction and was to receive some of the drugs in return. The rendezvous was ultimately called off, although defendant briefly met one of the intermediaries, "Pablo." Defendant claimed Jones and Pablo drove him to see his son Joseph at the home of his first wife, Joseph's mother. Jones then dropped defendant off at the motel and asked him to spend the night there, saying she would contact him the next day. Defendant spent the night alone in the motel room, drinking and taking methamphetamine that Jones had given him.

Defendant denied any complicity in Jones's murder. He spoke with Jones over the telephone the next morning, October 31, and she was all right. Later in the afternoon, however, he saw Jones's van parked in the motel parking lot. He approached the vehicle and saw the driver's door open and the keys in the ignition. He sat down in the van, looked into the back and saw Jones's body with a garrote tied around her neck. Defendant admitted he had made the garrote, but he claimed he had done so at Jones's request because "she thought she might need it later on down the line."

Defendant moved Jones's body to the bench-type seat in the rear of the van and covered her up. Some of his personal belongings that were in the van—a footlocker, a chest and some papers—appeared to have been searched. Defendant "freaked out" and felt he had to get away from there. He did not call the police out of fear he would immediately be blamed for Jones's death, and also because he was obsessed with going to Hesperia to confront Stopher and find out what was going on in Rose V.'s home.

Defendant drove Jones's van to the Greyhound bus terminal to pick up his son Joseph, then picked up his belongings and other weapons at his brother-in-law's house. He admitted using a ruse to get Lostaunau out of the house so that he could take weapons, including a .22-caliber rifle and a .22-caliber derringer, from the residence. Defendant was concerned about Lostaunau since he was an ex-police officer and was aware of defendant's parole status.

Defendant drove to Hesperia in the company of his son with Jones's body secreted in the rear of her van. He brought Halloween masks to use as a ruse to gain entry into Rose V.'s house. He claimed he was drinking beer and scotch while en route. He recounted the brief encounter with a member of the Hesperia Fire Department while parked in the van in the vicinity of Rose V.'s house. He claimed he was in an angry rage when he barged through the front door wielding a shotgun, broke down the locked master bathroom door, and observed Stopher in the shower. Defendant testified, "I saw a person that appeared to be a man with no penis or testicles screaming at me, telling me to get the fuck out of his house, threatening me; and I had a shotgun in my hand." Defendant admitted he killed Stopher with the shotgun, stating he did so because Stopher "took [his] life." He then "grabbed" Rose V. and ran out of the house to the van. When asked why he grabbed Rose V. and forced her to accompany him, defendant testified, "I don't know. I—I have thought about that. I wanted to talk to her. I don't know."

Defendant recounted the events of the return trip. He testified he never forced his son to rape Rose V. He admitted he had so testified at Joseph's trial in juvenile court, but claimed he had lied in that proceeding to protect

his son. He recollected how he was stopped by Coachella Police Officer Dunavent approximately 10 miles outside the city of Mecca. He testified he did not intend to kill Officer Dunavent, and did not have a gun in his hand when he got out of the van to confront the officer. When asked if he put a gun to the officer's head, defendant replied, "I don't remember that. No." Defendant admitted having the .380 pistol in hand by the time he attempted to run. He claimed he only fired his weapon at Officer Dunavent after the officer drew his service revolver first and shot him in the leg.

Anthropologist Michael Winkelman, who specializes in cross-cultural relations between Hispanic- and Anglo-Americans, testified that the Mexican-American subculture in the United States is characterized by an extreme emphasis on the importance of the extended family and protecting the family's honor. According to Winkelman, defense of the family's honor might require a man to take aggressive or even violent action, and such acts would be viewed as honorable regardless of how they are viewed under the law. Winkelman testified that the Mexican-American subculture views homosexuality in the lowest of terms, lesbianism as particularly abhorrent, and divorce as unacceptable. He would expect a response of outrage from an imprisoned Mexican-American male who learns his wife is involved in a lesbian relationship and is divorcing him.

Dr. Arnold Purisch, a clinical psychologist, testified that brain scans performed on defendant two to three years after the murders revealed he suffered from lesions in the frontal lobes of the brain. The effects of stress, alcohol, and drugs on such lesions could lead to a condition known as "conditional neurological lesion." A person with damage to his frontal lobes would have somewhat intact intelligence but difficulty with his behavior in unstructured or unfamiliar situations, or when required to think on his feet.

### 3. *Rebuttal*

Detective Gary Stroup, who first discovered Jones's body in the van, testified he contacted defendant in the hospital to ask him about the vehicle. Defendant told Detective Stroup he had rented the van from someone named "Edwin," and that he did not know the whereabouts of the owner of the van.

### B. *Penalty Phase*

### 1. *Prosecution evidence*

It was stipulated that all the evidence introduced in the guilt phase could be considered by the jury in deliberation of penalty. The prosecution additionally presented evidence of the circumstances underlying defendant's

prior conviction of assault with a deadly weapon (vehicle) on a peace officer, and his possession of razor blades while in jail. (§ 190.3, factor (b).) During the drunk-driving incident that led to the assault conviction, defendant sought to evade arrest by leading six to 10 Bakersfield police units on a high-speed chase; he attempted to run over two officers on foot and rammed his vehicle into one of the patrol cars. At the time of the jail search that led to the discovery of the razor blades, defendant threatened jail deputies with the statement, "I'm going to get the gas chamber and before I leave here, I'm going to take out a deputy."

## 2. *Defense evidence*

Officer Rodney Johnson was involved in the pursuit and arrest of defendant during the prior drunk-driving and assault incident. Officer Johnson testified defendant was extremely intoxicated at the time of his arrest.

Defendant's mother testified that defendant spoke only Spanish during his early years of school and was teased by the White students. Defendant quit school to join the Marines at age 16. Defendant's brother testified that defendant was deployed to Cuba during the Cuban Missile Crisis and received various military awards. Both defendant's brother and sister asked for his life to be spared. Lawrence Biedebach testified that defendant offered to serve as a witness on his behalf, when no one else would come forward, in a matter involving an assault by five police officers on Biedebach. Rodney Zenk participated in an alcohol rehabilitation program together with defendant and believed defendant could serve society by working with prison inmates on alcoholism issues. Annabelle Hood recalled an incident when defendant's ex-wife rescued Hood's baby daughter from a near drowning and defendant performed CPR on the child.

Jerry Enomoto, a former Director of the California Department of Corrections, testified for the defense as an "independent consultant on correctional matters." Enomoto testified defendant told him he kept the razor blades in jail to cut a fungus condition he had on his hands, and "to sharpen pencils or cut things," but not for use as weapons. Enomoto reviewed various documents from defendant's central file and testified there was nothing to indicate any history of violence during his institutional confinement. Enomoto believed defendant would get along well in a "level IV" institutional placement, albeit the highest level of security in the prison system. Enomoto also testified about two letters in evidence that defendant wrote to other inmates in which he related that a prison deputy had allegedly been disciplined for violating his and other inmates' civil rights. Defendant wrote, "he [the deputy] might go to jail, so I might kill again." Enomoto discussed

the statements in the letters with defendant, who explained there was "no meaning behind it except anger."

## II. DISCUSSION

### A. *Pretrial/Jury Selection Issues*

#### 1. *Territorial jurisdiction/vicinage*

 Defendant argues the San Bernardino County Superior Court lacked territorial jurisdiction to try him for the murder of Billie Faye Jones (count I), and for the attempted murder of Officer Dunavent (count VII). He urges that because Jones's murder took place in Kern County, only that county had territorial jurisdiction over the crime, and even if Jones's murder could instead be tried in the county where her body was found, the proper jurisdiction would be Riverside County, where Jones's van was first seized upon defendant's arrest. Defendant argues that only Riverside County had territorial jurisdiction over the crime of attempted murder of Officer Dunavent because that is the county in which the shootout with Officer Dunavent took place.

Section 790, subdivision (a) provides, in pertinent part, "The jurisdiction of a criminal action for murder or manslaughter is in the county where the fatal injury was inflicted or in the county in which the injured party died *or in the county in which his . . . body was found . . . .*" (Italics added.) The amended information alleged that San Bernardino County had territorial jurisdiction over Jones's murder because her body was found in that county within the meaning of section 790. The magistrate at the preliminary hearing made an express finding that San Bernardino County had jurisdiction over Jones's murder pursuant to section 790. In opposing defendant's first motion to dismiss count I of the information in the trial court, the prosecutor argued that since Jones's body was first discovered in San Bernardino County concealed in the back of the van at the sheriff's storage facility, that county had jurisdiction over her murder pursuant to section 790. He argued further that while defendant claimed Jones's murder occurred in Kern County— where he allegedly discovered her strangled in the van on the afternoon of October 31, 1986, and in which county she was last seen alive—there was no direct evidence at the preliminary hearing to establish with certainty where Jones had been killed.

The trial court denied the motion to dismiss count I, finding there was sufficient evidence to support the magistrate's ruling that San Bernardino County had jurisdiction over the Jones murder. The court specifically found

the evidence did not conclusively establish where Jones was killed, and that Jones's body had been found in San Bernardino County, two to three days after the van had been impounded in that county's sheriff's storage facility. A second motion to dismiss was brought on the same grounds after a substitution of counsel per *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]; the trial court again denied the motion.

These rulings were correct. ■ Whether jurisdiction was proper was a question of fact, which the prosecution had the burden of proving by a preponderance of the evidence. (*People v. Cavanaugh* (1955) 44 Cal.2d 252, 262 [282 P.2d 53].) On review, a trial court's determination of territorial jurisdiction will be upheld as long as there is "some evidence" to support its holding. (*People v. Kellett* (1982) 134 Cal.App.3d 949, 956 [185 Cal.Rptr. 1]; *People v. Tabucchi* (1976) 64 Cal.App.3d 133, 141 [134 Cal.Rptr. 245].) ■ Here, the evidence established that Jones's body was found in San Bernardino County, in a decomposed state and concealed inside her van, which had been impounded by police in Riverside County and towed to the San Bernardino storage facility several days earlier. Under a plain reading of the word found as used in section 790, both the magistrate and the trial court properly rejected defendant's claim that because police first seized the van in Riverside County, they had "found" Jones's body in that county.

■ The trial court also properly found that San Bernardino County had territorial jurisdiction over the attempted murder of Officer Dunavent (count VII) pursuant to section 781. Section 781 provides, "When a public offense is committed in part in one jurisdictional territory and in part in another, *or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories*, the jurisdiction of such offense is in any competent court within either jurisdictional territory." (Italics added.)

The amended information alleged that the attempted murder of Officer Dunavent occurred in Riverside County, but that San Bernardino County had territorial jurisdiction over the offense because (1) the acts or effects of the attempted murder were requisite to the consummation of the other crimes charged, within the meaning of section 781, and (2) acts preliminary to and connected to the crime occurred in San Bernardino County, within the meaning of section 781. The magistrate at the preliminary hearing made an express finding that San Bernardino County had jurisdiction over the attempted murder of Officer Dunavent pursuant to section 781. In opposing defendant's first motion to dismiss the information, the prosecutor argued defendant attempted to murder Officer Dunavent in Riverside County in order to avoid detection and apprehension for the kidnapping of Rose V.,

which crime commenced in San Bernardino County and was ongoing, with Rose V. bound and gagged in the van, as she was transported through Riverside County.

In denying the first motion to dismiss count VII, the trial court found there was sufficient evidence to support the magistrate's ruling that San Bernardino County had jurisdiction over the attempted murder of Officer Dunavent. The court specifically found that the attempted murder was "requisite to the consummation of" Rose V.'s kidnapping. The trial court reiterated its ruling in denying the second motion to dismiss count VII.

These rulings were correct. ■ The holding in *People v. Bismillah* (1989) 208 Cal.App.3d 80, 85 [256 Cal.Rptr. 25], is instructive: "Section 781 constitutes an exception to the rule when acts or effects of an offense occur in multiple counties. Section 781 is remedial and, thus, we construe the statute liberally to achieve its purpose of expanding criminal jurisdiction beyond rigid common law limits. [Citations.] We therefore interpret section 781 in a commonsense manner with proper regard for the facts and circumstances of the case rather than technical niceties. [Citation.] [¶] Courts have construed the phrase 'requisite to the consummation of the offense' to mean requisite to achieving the offender's unlawful purpose. [Citation.] Pursuant to this interpretation, venue is proper in a county where only preliminary arrangements or acts leading to commission of the crime occur, even though such acts are not essential elements of the charged offense." (Fn. omitted; see also *People v. Kellett, supra,* 134 Cal.App.3d at p. 956; *People v. Tabucchi, supra,* 64 Cal.App.3d at p. 140.)

■ Here, defendant attempted to kill Officer Dunavent to avoid detection and arrest for the ongoing kidnapping of Rose V. that was initiated in her home in San Bernardino County, where Stopher was killed. Contrary to defendant's claim, the fact that his attempted murder of Officer Dunavent took place in Riverside County is not dispositive, nor is it relevant that Officer Dunavent was not investigating the rape and kidnapping of Rose V., or that he had stopped defendant for an unrelated traffic infraction moments before the shootout. Defendant's attempted murder of Officer Dunavent to thwart detection and arrest was "requisite to the consummation of the [ongoing kidnapping]." (§ 781.) Since the kidnapping commenced in San Bernardino County, that county had jurisdiction to try the attempted murder charge.

■ Defendant further contends that his right to a jury drawn from the vicinage of the crimes was violated because, in his view, that right requires that each crime be tried before a jury drawn from the county (more particularly, the judicial district) in which that crime occurred.

The Sixth Amendment right to vicinage was not incorporated by the Fourteenth Amendment against the states—hence, the trial of all consolidated counts in this capital murder prosecution in San Bernardino County Superior Court offended no federal constitutional right of defendant's. (See *People v. Ochoa* (2001) 26 Cal.4th 398, 426 [110 Cal.Rptr.2d 324, 28 P.3d 78]; *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1065 [108 Cal.Rptr.2d 409, 25 P.3d 618].) We find further that in the present case the same facts making venue proper in San Bernardino County also established that the charged crimes were committed in that county for vicinage purposes. Defendant transported the body of murder victim Jones, concealed in her van, through Kern, Riverside, and San Bernardino Counties; Jones's decomposed body was ultimately found in the van while it was impounded in a San Bernardino County Sheriff's storage facility. After killing Stopher, defendant kidnapped Rose V. from her home in San Bernardino County, bound and gagged her in the van, and transported her into Riverside County where, in an effort to avoid detection and arrest for his ongoing crime, defendant attempted to murder Officer Dunavent during the traffic stop.

By these acts, defendant extended his commission of the murder of Jones into San Bernardino County, and his commission of the attempted murder of Officer Dunavent was a direct consequence of his ongoing crime of kidnapping commenced in San Bernardino County—"at least under the broad concept of commission courts have applied for purposes of determining proper vicinage. (See *People v. Martin* (1995) 38 Cal.App.4th 883, 888-889 [45 Cal.Rptr.2d 502] [where killing was performed in Ventura County, but defendant disposed of body in Santa Barbara County, vicinage as well as venue over murder charge was proper in latter county]; *People v. Tamble* (1992) 5 Cal.App.4th 815, 820 [7 Cal.Rptr.2d 446] [burglary of motor home located in San Luis Obispo County may be tried in Santa Barbara County, without obtaining waiver of vicinage rights, because burglars brought loot into that county; provision of § 786 allowing prosecution in jurisdictional district into which stolen property is carried 'provides, in the broad sense, for prosecution where the crime was committed']; *People v. Campbell* (1991) 230 Cal.App.3d 1432, 1447 [281 Cal.Rptr. 870] [trial under § 786 accords with vicinage requirements because the statute 'require[s] at least some act within a county . . . requisite to the offense charged before jurisdiction will attach']; *State v. Howell* (1985) 40 Wash.App. 49 [696 P.2d 1253, 1255] [theft of livestock may be prosecuted in county into which defendant allegedly took the cattle and tried to sell them: ' "[W]here the cause occurs in one county and the result in another," ' vicinage is proper in either].)" (*People v. Sakarias* (2000) 22 Cal.4th 596, 631-632 [94 Cal.Rptr.2d 17, 995 P.2d 152].)

Trial of counts I and VII in San Bernardino County did not violate defendant's vicinage rights.

## 2. *Severance*

 Defendant contends the trial court abused its discretion in denying his motions to sever trial of the murder of Jones from trial of the murder of Stopher and the remaining charges. He argues the error constituted a denial of his constitutional right to due process of law and a fair trial.

Section 954 provides that "[a]n accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately . . . ." Since the murders of Jones and Stopher were offenses of the same class, joinder was permissible in the first instance. (*People v. Catlin* (2001) 26 Cal.4th 81, 110 [109 Cal.Rptr.2d 31, 26 P.3d 357]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1315 [65 Cal.Rptr.2d 145, 939 P.2d 259] (*Bradford*).)

 " ' "The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." [Citation.] [¶] . . . Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.' " (*Bradford, supra,* 15 Cal.4th at p. 1315.)

"Significantly, if evidence on each of the joined crimes would have been admissible in a separate trial of the other crimes, such cross-admissibility ' " 'ordinarily dispels any inference of prejudice . . . .' " ' " ' ([*Bradford, supra,* 15 Cal.4th] at p. 1316.) We examine the record before the trial court at the time of its ruling to determine whether the court abused its discretion in denying the severance motion. (*People v. Price* (1991) 1 Cal.4th 324, 388 [3 Cal.Rptr.2d 106, 821 P.2d 610].)" (*People v. Catlin, supra,* 26 Cal.4th at pp. 110-111, fn. omitted.)[5]

 One of the main factors considered by the trial court in denying severance was the cross-admissibility of the evidence with respect to all the

[5]In a footnote, the *Catlin* court noted that "[n]ew constitutional and statutory provisions adopted by Proposition 115, adopted in June 1990 (see Cal. Const., art. I, § 30, subd. (a); Pen. Code, § 954.1) were not in effect at the time of the ruling on the severance motion and are not

charges. We agree. Defendant's crimes were all connected. He used Jones's van, while her body lay concealed in the rear of the vehicle with the murder weapon, a garrote, still tied around her neck, to drive to Hesperia to murder Stopher, and then to kidnap Rose V., aid and abet her rape, and transport her across county lines until his apprehension after the shootout and attempted murder of Officer Dunavent. Notes in defendant's handwriting were recovered from the van supporting the inference that he had planned Jones's murder (e.g., "make garrote") so he could use her van to travel to Hesperia and do harm to Stopher and Rose V. (e.g., "gather all necessities . . . Halloween store, wig shop . . . carpet . . . gas cans . . . shovels"). There was also the evidence of statements made by defendant to Detective Yanez, shortly after his arrest, in which he admitted having committed the two murders. (E.g., "Oh God. I didn't mean to kill both of them.")

The underlying evidence of each offense would have been admissible in a separate trial of the others to prove identity, motive, premeditation, planning and deliberation. Nor was this a situation where a weak case was joined with a strong one in order to produce a spillover effect that unfairly strengthened or bootstrapped the weak case. (See *Frank v. Superior Court* (1989) 48 Cal.3d 632, 639-641 [257 Cal.Rptr. 550, 770 P.2d 1119].) Although defendant admitted fatally shooting Stopher while denying complicity in the murder of Jones, in light of the evidence summarized above connecting defendant to Jones's murder, the prosecution's case against him for that murder, independent of his murder of Stopher, can hardly be characterized as a "weak" one. Moreover, this is not a situation in which convictions of both murders had to be secured in order to qualify defendant for the death penalty. Multiple murder was not the only special circumstance that rendered defendant death eligible; the lying-in-wait special circumstance alleged and found true in connection with Stopher's murder itself qualified defendant for the ultimate penalty.

We conclude the trial court was within its sound discretion in denying defendant's motion to sever the Jones murder charge from the remaining charges. (*People v. Price, supra,* 1 Cal.4th at p. 388.)

3. *Wheeler error*

█ Twice during voir dire defendant claimed the prosecution was exercising its peremptory challenges to improperly excuse prospective Hispanic jurors on the basis of race, in violation of the federal and state Constitutions. (See *Batson v. Kentucky* (1986) 476 U.S. 79, 84-89 [106 S.Ct.

considered here. (See *People v. Bradford, supra,* 15 Cal.4th at p. 1314, fn. 13.)" (*People v. Catlin, supra,* 26 Cal.4th at p. 111, fn. 3.) That observation likewise applies here.

1712, 1716-1719, 90 L.Ed.2d 69]; *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).) The motions were denied, and the *Wheeler* claim is here renewed on appeal.

■ Prospective jurors may not be excluded from jury service based solely on the presumption that they are biased because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds. (*People v. Johnson* (1989) 47 Cal.3d 1194, 1215 [255 Cal.Rptr. 569, 767 P.2d 1047] (*Johnson*); *Wheeler, supra,* 22 Cal.3d at p. 276.) A defendant bears the burden of establishing a prima facie case of *Wheeler* error. (*People v. Turner* (1994) 8 Cal.4th 137, 164 [32 Cal.Rptr.2d 762, 878 P.2d 521] (*Turner*).) If the court finds a prima facie case has been shown, the burden shifts to the prosecution to provide race-neutral reasons for the questioned peremptory challenges. (*Ibid.*) The prosecutor need only identify facially valid race-neutral reasons why the prospective jurors were excused. (*Purkett v. Elem* (1995) 514 U.S. 765, 767 [115 S.Ct. 1769, 1770-1771, 131 L.Ed.2d 834]; *People v. Silva* (2001) 25 Cal.4th 345, 384 [106 Cal.Rptr.2d 93, 21 P.3d 769].) The explanations need not justify a challenge for cause. (*Turner, supra,* 8 Cal.4th at p. 165.) "Jurors may be excused based on 'hunches' and even 'arbitrary' exclusion is permissible, so long as the reasons are not based on impermissible group bias. (*People v. Hall* (1983) 35 Cal.3d 161, 170 [197 Cal.Rptr. 71, 672 P.2d 854].)" (*Turner, supra,* 8 Cal.4th at p. 165.)

"While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection." (*Turner, supra,* 8 Cal.4th at p. 168.) Initially, we note that the petit jury and four alternates chosen to hear defendant's case included four Hispanics: Raul M., Daniel M., Richard P. and Cynthia M. At one point during jury selection the prosecutor accepted the jury with six Hispanics included (Rudolph J., Raul M., Ray V., Arthur A., Richard P. and Cynthia M.); at another point he accepted the jury with five Hispanics (Ray V., Raul M., Arthur A., Richard P. and Cynthia M.).

■ When defendant first raised a *Wheeler* objection, the court expressly found no prima facie case but nonetheless allowed the prosecutor to state his reasons for the peremptory challenges on the record. Allowing the prosecutor to do so did not in itself constitute an implied finding of a prima facie case. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1200 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) In contrast, when defendant renewed the motion, the court made no express finding that a prima facie case had not been demonstrated but instead immediately asked the prosecutor to justify

the questioned challenges. This does suggest an implied finding of a prima facie case. (*People v. Hayes* (1990) 52 Cal.3d 577, 605 [276 Cal.Rptr. 874, 802 P.2d 376].) The court proceeded to consider the challenges to each prospective juror individually.

 Defendant claimed four prospective jurors were challenged for purely racial reasons: April P., Eva J., Arthur A. and Sergio L. He also summarizes the prosecutor's reasons for peremptorily excusing three other prospective jurors: Ernestine C., Daniel A. and Rudolph J. Defendant concedes there were race-neutral grounds for the challenge to Rudolph J.; his position on the excusal of Ernestine C. and Daniel A. is less than clear.

April P. is not of Hispanic origin; she apparently acquired her Hispanic surname through marriage. Defendant argued below that this "counts," and he reasserts that position here. He is wrong. True, in *People v. Trevino* (1985) 39 Cal.3d 667, 684 [217 Cal.Rptr. 652, 704 P.2d 719], (disapproved on other grounds in *Johnson, supra,* 47 Cal.3d at pp. 1219-1221) we held that "Spanish surnamed" sufficiently describes the cognizable class Hispanic under *Wheeler*—but only where no one knows at the time of the challenge whether the Spanish-surnamed prospective juror is Hispanic. (*People v. Trevino, supra,* 39 Cal.3d at p. 686.) Here, April P. twice indicated on her juror questionnaire that she was White, and when the trial court asked her for the record whether she was Hispanic, she replied "No." Although the record reflects ample race-neutral reasons for the challenge to April P., we need not discuss them here, as her excusal was not based on race within the meaning of defendant's *Wheeler* challenge.

As noted, at one point the prosecutor accepted the jury while Rudolph J. was seated in the jury box. Defendant concedes on appeal that there were race-neutral grounds for Rudolph J.'s excusal. The record also reflects that Rudolph J. opposed the death penalty. Although he indicated he would not automatically vote against it, there were further indications he had serious reservations about voting for it. Rudolph J. stated he could not face defendant after voting to put him to death. He indicated the death penalty frightened him, that if he voted for death he would have to "pay for it in the end," and that he would rather have someone else make the decision. These statements alone would have served as valid race-neutral grounds for Rudolph J.'s excusal. (*Johnson, supra,* 47 Cal.3d at pp. 1218-1219.)

On two occasions during voir dire the prosecutor accepted the jury while Arthur A. was seated in the jury box. However, it also surfaced that Arthur A.'s father had been imprisoned for drug-related crimes. This alone could serve as a valid race-neutral reason to excuse him. (See *People v. Cummings*

(1993) 4 Cal.4th 1233, 1282 [18 Cal.Rptr.2d 796, 850 P.2d 1] [fact that prospective juror's relative had been convicted of a crime was a proper consideration justifying peremptory challenge]; *People v. Sims* (1993) 5 Cal.4th 405, 430 [20 Cal.Rptr.2d 537, 853 P.2d 992] [same].) Arthur A. also related he had had a run-in with a California Highway Patrol officer who stopped him for a traffic offense and allegedly tried to "rough [him] up" and harass him. Although Arthur A. claimed he harbored no bad feelings about the episode, the prosecutor could still retain some doubts. This circumstance too could alone serve as a race-neutral reason to excuse Arthur A. (See *Johnson, supra,* 47 Cal.3d at p. 1215 [peremptory challenge justified where prospective juror complained of police harassment].) Finally, during questioning Arthur A. indicated he might rely too heavily on the expert opinion testimony of psychologists; he stated he could not vote for the death penalty if a psychologist concluded defendant had a mental problem that affected his conduct. Since the prosecutor anticipated defendant would claim his state of mind at the time of the crimes would not support a conviction for Stopher's murder, Arthur A.'s potential reaction to expert opinion testimony on mental defect defenses was an important concern. Each of these reasons, individually or in the aggregate, could serve to justify the peremptory challenge of Arthur A.

The prosecutor peremptorily challenged Eva J. because she appeared extremely emotional and overwhelmed by outside stresses, conditions that might compromise her ability to concentrate or fairly deliberate on the evidence. She cried twice during voir dire, and the trial court's notes confirmed the prosecutor's belief that she was unduly "emotional." Numerous times during voir dire Eva J. referred to her "nerves" and to being under considerable stress. Although she thereafter opined that her emotional state and the stressful circumstances would not interfere with her ability to consider the evidence, the prosecutor's lingering concerns appear justified. Factors indicating a difficulty or inability to focus on the evidence may serve to justify a peremptory challenge. (See *Mitchell v. Superior Court* (1984) 155 Cal.App.3d 624, 628 [202 Cal.Rptr. 284].)[6]

■ The prosecutor indicated he challenged Sergio L. primarily out of concern that he would place too much weight on the opinion testimony of psychologists. As a teacher, Sergio L. had never disagreed with a psychologist's evaluation of a student. When asked if he could disregard a psychologist's opinion that he considered unreasonable, Sergio L. responded, "Well,

---

[6]The prosecutor apparently misunderstood some of Eva J.'s responses concerning her views on the death penalty as unduly favoring the defense. Although the prosecutor identified such as an additional reason for peremptorily challenging her, we agree with respondent that the record suggests the prosecutor's mistaken belief was sincere and not a wilfully manufactured pretext for excusing a Hispanic juror, as urged by defendant.

if he's an expert I don't know how I really could disregard it. I'd listen to it. Because I'm not expert in that field." At one point during voir dire the trial court deemed it necessary to instruct Sergio L., in response to one of his answers, that it was the ultimate responsibility of the jurors to assess the credibility of witnesses, whether expert or otherwise. Sergio L.'s attitude could reasonably be found to reflect a bias in favor of a class of potential witnesses, i.e., expert witnesses, which could serve to justify exclusion. (*Johnson, supra,* 47 Cal.3d at p. 1215.)

The prosecutor also explained his concern that Sergio L. was "in the defense camp" when he seemed to keep agreeing with the defense, and when he related a previous jury experience where he believed some jurors had made up their minds before the defense had presented its case. If the prosecutor sincerely believed Sergio L. would be skeptical of the People's evidence, this too alone could justify the peremptory challenge. (*Johnson, supra,* 47 Cal.3d at p. 1217.) The prosecutor also indicated Sergio L. had given him looks that made him uncomfortable. Hostile looks from a prospective juror can themselves support a peremptory challenge. (*Turner, supra,* 8 Cal.4th at p. 171; *Wheeler, supra,* 22 Cal.3d at p. 275.) During voir dire Sergio L. also stated he felt transsexuals were "sick human beings." Given murder victim Stopher's sexual orientation, the prosecutor could rightfully harbor concern that Sergio L. might be biased against one of the victims in the case. At one point Sergio L. commented that he would not be influenced by anyone's opinion but his own. The prosecutor could rightfully feel concerned that he would not be able to consider the opinions of his fellow jurors, itself another valid ground for a peremptory challenge. (*People v. Davenport, supra,* 11 Cal.4th at p. 1203.) Finally, the prosecutor was aware that Sergio L. had initially requested to be relieved from jury service for work-related reasons. On this record, we find ample grounds to support the trial court's determination that Sergio L. was excused for valid race-neutral reasons.

Ernestine C.'s negative experiences with law enforcement prompted the prosecutor to conclude she had a "jaundiced view" of the trial process that might hamper her from focusing on the evidence. She gave a lengthy and detailed account of her son's arrest for drunk driving, claiming he was harassed by authorities and falsely accused of using drugs while at a weekend facility in connection with the charge. Her claim that she could remain impartial could be discounted in light of her fixation on the incident, which she related in great detail. She also related she had received an unfair parking ticket, which she successfully fought. A prospective juror's negative experiences with law enforcement can serve as a valid basis for peremptory challenge. (*Turner, supra,* 8 Cal.4th at p. 171.)

The prosecutor challenged Daniel A. based on his strongly biased views against the death penalty. All of Daniel A.'s answers on the jury question-naire reflected his strong opposition to the death penalty: he felt it was unfair, he had moral objections to it, he would vote to abolish it if given the opportunity, and he would automatically vote for life imprisonment. Al-though Daniel A. suggested his views were otherwise upon questioning during voir dire, the prosecutor justifiedly remained skeptical, and the circumstances supported the peremptory challenge. (*Johnson, supra,* 47 Cal.3d at pp. 1218-1219.)

Once a trial court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror, we accord great deference to its conclusion. (*People v. Fuentes* (1991) 54 Cal.3d 707, 720 [286 Cal.Rptr. 792, 818 P.2d 75]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1197-1198 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) On this record we conclude the *Wheeler* motions were properly denied.

B. *Guilt Phase Issues*

1. *Corpus delicti of rape (count V); admission of defendant's juvenile court testimony regarding the rape; sufficiency of evidence of rape*

 Defendant was charged in count V with aiding and abetting his son in the forcible rape of Rose V. (§ 261, subd. (a)(2).) Defendant contends the only evidence of his aiding and abetting the rape came from his testi-mony on behalf of his son at the latter's juvenile hearing, and that the corpus delicti of the crime of rape was not independently established as the neces-sary predicate for introduction of such extrajudicial statements. Respondent in turn argues that since defendant's admissions were made during a judicial proceeding (his son's juvenile hearing), they were not "extrajudicial" admis-sions within the meaning of the corpus delicti rule such as would require corroboration under that rule. Respondent also urges that although defend-ant, in his first pretrial motion to dismiss (§ 995), asserted there was insufficient evidence to establish the corpus delicti of rape, he did not thereafter specifically object at trial to admission of his juvenile court testimony on corpus delicti grounds, and has therefore waived the claim on appeal. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 186 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

 "In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying

*exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant. (E.g., *People v. Ochoa* (1998) 19 Cal.4th 353, 404 [79 Cal.Rptr.2d 408, 966 P.2d 442] . . . ; *People v. Jones* [(1998)] 17 Cal.4th 279, 301 [70 Cal.Rptr.2d 793, 949 P.2d 890]; *People v. Jennings* (1991) 53 Cal.3d 334, 364 [279 Cal.Rptr. 780, 807 P.2d 1009] . . . ; *People v. Wright* (1990) 52 Cal.3d 367, 403 [276 Cal.Rptr. 731, 802 P.2d 221] . . . ; *People v. Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1] . . . ; *People v. Cobb* (1955) 45 Cal.2d 158, 161 [287 P.2d 752]; *People v. Amaya* (1952) 40 Cal.2d 70, 75-76 [251 P.2d 324]; *People v. Simonsen* (1895) 107 Cal. 345, 347 [40 P. 440]; 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 45, p. 250.) Though mandated by no statute, and never deemed a constitutional guaranty, the rule requiring some independent proof of the corpus delicti has roots in the common law. (Crisera, *Reevaluation of the California Corpus Delicti Rule: A Response to the Invitation of Proposition 8* (1990) 78 Cal. L.Rev. 1571, 1572-1573 . . . .)" (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169 [119 Cal.Rptr.2d 903, 46 P.3d 372] (*Alvarez*).)

Recently, in *Alvarez, supra,* 27 Cal.4th 1161, we held that article I, section 28, subdivision (d) of the California Constitution, the "Truth in Evidence" provision adopted by Proposition 8 in 1982, abrogated any corpus delicti basis for excluding a defendant's extrajudicial statements from evidence. (*Alvarez,* at p. 1165.) Accordingly, we need not decide whether defendant adequately preserved a corpus delicti objection to the admissibility of his juvenile court testimony, nor whether any admissions made during that testimony, themselves having been made in another judicial proceeding, were nonetheless "extrajudicial" admissions for purposes of the corpus delicti rule.

We further held in *Alvarez* that California Constitution article I, section 28, subdivision (d) "*did not* abrogate the corpus delicti rule insofar as it provides that every *conviction* must be supported by some proof of the corpus delicti *aside from* or *in addition to* such statements, and that the jury must be so instructed." (*Alvarez, supra,* 27 Cal.4th at p. 1165.)

 To the extent defendant is renewing his claim that the corpus delicti of the crime of rape was not established below, his contention must fail. In *People v. Wright, supra,* 52 Cal.3d 367, we explained: "The elements of the corpus delicti are (1) the injury, loss or harm, and (2) the criminal agency that has caused the injury, loss or harm. (*Jones* v. *Superior Court* (1979) 96 Cal.App.3d 390, 393 [157 Cal.Rptr. 809].) 'The independent proof may be by circumstantial evidence [citation], and it need not be beyond a reasonable doubt. A slight or prima facie showing, permitting the

reasonable inference that a crime was committed, is sufficient. [Citations.]' (*People* v. *Alcala* (1984) 36 Cal.3d 604, 624-625 [205 Cal.Rptr. 775, 685 P.2d 1126].) It is not necessary for the independent evidence to establish that the defendant was the perpetrator. (*People* v. *Cullen* (1951) 37 Cal.2d 614, 624 [234 P.2d 1]; *Jones, supra,* at p. 393.)" (*People v. Wright, supra,* 52 Cal.3d at p. 404; see also *People v. Jennings, supra,* 53 Cal.3d 334, 368 ["We reemphasize that the quantum of evidence the People must produce in order to satisfy the corpus delicti rule is quite modest; case law describes it as a 'slight or prima facie' showing. [Citations.]"].)

 At trial, Rose V. testified that after defendant killed Stopher, defendant and Joseph dragged her out of the house and forced her into Jones's van. Defendant twice hit her on the back of the head with the rifle or shotgun. She was also hit behind her right ear with a hard object she could not identify. As they drove off and entered the freeway, defendant and Joseph kept telling Rose V. to shut up. Defendant told Joseph to gag her and tie her up. Defendant warned Rose V. that if she did not cooperate, Joseph would cut her. Joseph tied her hands behind her back with rope, tied her ankles, blindfolded and gagged her. Rose V. testified that the man wearing the mask (later identified as Joseph) then raped her. He cut off her bra with a knife and sliced a half-inch cut in her ankle when he could not remove her pants and had to cut the rope that bound her feet. When Joseph finished raping Rose V., defendant told him to make sure she could breathe and to cover her with a sheet.

Rose V.'s testimony regarding her rape, together with the corroborating circumstantial evidence, plainly established the corpus delicti of the crime independent of defendant's admissions made at Joseph's juvenile court hearing. But defendant argues further that even if the corpus delicti of forcible rape was established generally, since he was charged only as an aider and abettor of Joseph, who was the direct perpetrator of the rape, no evidence independent of defendant's admissions at the juvenile hearing established his role as an aider and abettor of the crime.

Defendant misconstrues the corpus delicti rule. It is not necessary for independent evidence to establish defendant as the perpetrator in order to satisfy the rule. (*People v. Cullen, supra,* 37 Cal.2d at p. 624; *Jones v. Superior Court, supra,* 96 Cal.App.3d at p. 393.) More specifically, it has been held that in a case tried on an aiding and abetting theory, the requisite knowledge and intent required for aider-abettor liability are not elements of the corpus delicti that must be proved independently of any extrajudicial admissions for purposes of establishing the corpus delicti. (*People v. Ott* (1978) 84 Cal.App.3d 118, 131 [148 Cal.Rptr. 479] ["the corpus delicti must

be established with respect to the underlying criminal offense, rather than the theory of aiding and abetting which, in the absence of the commission of the main crime, would not be punishable at all"], disapproved on other grounds in *People v. Beeman* (1984) 35 Cal.3d 547, 556-559 [199 Cal.Rptr. 60, 674 P.2d 1318].)

 Last, defendant argues the evidence was insufficient to support his conviction of aiding and abetting his son's forcible rape of Rose V. The claim was raised and rejected in a Penal Code section 1118.1 motion for judgment of acquittal at the close of the People's case-in-chief. It is without merit. We have explained that defendant cannot assert a violation of the corpus delicti rule as a ground for excluding any incriminating admissions made during his testimony at the juvenile hearing, and that in any event, the corpus delicti of the crime of forcible rape was independently established exclusive of such admissions. In denying defendant's second pretrial motion to dismiss the forcible rape charge, the trial court found that any incriminating statements made at the juvenile hearing were admissions within the meaning of Evidence Code section 1220. At trial, when defendant again objected to the reading of redacted portions of his testimony from Joseph's juvenile court hearing, the trial court held a hearing pursuant to Evidence Code section 402, subdivision (b), and made findings that defendant was represented by counsel at the juvenile proceeding, had waived his right against self-incrimination, and that his testimony was not coerced and was freely and voluntarily given. The credibility of defendant's testimony at the juvenile proceeding was an issue for the jury's determination.

The trial court's rulings were correct and supported by the evidence. At the juvenile hearing, defendant had testified that at some point he stopped the van, got into the back, told Joseph to go to the front of the van, and then had intercourse with Rose V. He testified he then ordered Joseph to "fuck her," and forced his son to rape Rose V. Defendant specifically testified at the juvenile hearing that he loved his son but was not lying to protect him. In contrast, at his own trial defendant testified he was driving the van and was unaware of the rape when it occurred, that he did not tell Joseph to rape Rose V., and that he lied at Joseph's juvenile court hearing in order to protect his son. It fell to the jury to sort out the credibility of defendant's testimony. To the extent defendant claimed at the juvenile hearing that he had also raped Rose V., such testimony conflicted with Rose V.'s account of the crime in both her preliminary hearing and trial testimony—she testified defendant did not rape her. Contrary to defendant's criticism that the prosecution presented conflicting theories of the rape in the two proceedings and sought to have it both ways, the prosecution did not charge defendant as a direct perpetrator of the forcible rape of Rose V., but instead specifically charged him as an

aider and abettor of Joseph's crime. The jury remained free to credit defendant's juvenile hearing testimony that he aided and abetted Joseph's act of forcible rape.

We need determine only " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [99 S.Ct. 2781, 2789, 61 L.Ed.2d 560], italics omitted; see also *People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].)" (*People v. Catlin, supra,* 26 Cal.4th at p. 139.) Applying that standard, we find the evidence presented at trial, including Rose V.'s testimony of the circumstances surrounding her rape and defendant's admissible testimony from his son's juvenile court hearing on his own role in the crime, was sufficient to support his conviction of aiding and abetting the forcible rape of Rose V.

### 2. *Miranda/Harris: admission of defendant's extrajudicial statement regarding his acquisition of Jones's van for impeachment purposes*

During defendant's cross-examination, the prosecutor stated that he desired to question defendant about a statement he made at the hospital after invoking his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974]) while being questioned about Stopher's killing. The prosecutor identified defendant's statement as, "I rented the van from a guy by the name of Edwin." The prosecutor acknowledged the statement was inadmissible in his case-in-chief, but argued it should be admissible for the limited purpose of impeaching defendant pursuant to this court's decision in *People v. May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307] (*May*), implementing the holding of *Harris v. New York* (1971) 401 U.S. 222 [91 S.Ct. 643, 28 L.Ed.2d 1] (*Harris*), since defendant had testified on direct examination that he had found the van with Jones's body in it in the motel parking lot.

Upon defendant's objection, the court conducted a hearing on the admissibility of the statement pursuant to Evidence Code section 402, subdivision (b). Richard Spady, the physician who treated defendant at Riverside General Hospital on November 3, 1986, the date defendant made the statement, testified defendant had undergone an operation two days earlier, was in stable condition, and was having a normal postoperative recovery with normal mental functioning. Nurses' reports for the date in question reflected defendant was awake, alert, and fully oriented. He was on antibiotics and pain medication, but they would not be expected to appreciably affect his mental functioning. Dr. Spady testified there was nothing he observed that

would suggest defendant was not able to make a free and voluntary statement on the afternoon of the date in question.

Detective Stroup testified he attempted to interview defendant at the hospital at 5:30 p.m. on November 3, 1986. Defendant was coherent, although obviously in pain. When advised of his *Miranda* rights, defendant indicated he understood them. Detective Stroup asked defendant if he was willing to talk about the Stopher murder. At the time, the detective was unaware of Jones's murder or who owned the van defendant was driving upon his arrest. Defendant indicated he would talk a little bit, as much as he could without a lawyer being present. When asked about the murder of Stopher, defendant would not answer and indicated he should probably have a lawyer before answering such questions. Detective Stroup terminated the questioning. He then began a second interview of defendant to determine where the van had come from and from whom defendant had acquired it. Detective Stroup was not aware at that time that the owner of the van was, in fact, dead—his report just indicated police needed to know who the owner of the van was and how defendant had obtained the vehicle. The report further reflected that he told defendant during the second interview that anything he would say would not be used in court against him, and that this was "over and above his *Miranda* waiver." When asked by the court what he meant by that advisement, Detective Stroup explained, "That I was there to talk to him about the death of Mr. Stopher. And he—he'd advised me he didn't want to discuss that. And this was not dealing with Mr. Stopher." Detective Stroud testified that at that time he had no intention of using any information defendant gave him about how he obtained the van against him in court. Defendant told the detective he had rented the van from an individual by the name of "Edwin," that he did not know where the owner of the van was, and that he did not want to say anything else. Detective Stroup terminated the questioning.

The trial court ruled that the statement was obtained in violation of *Miranda* because it had been made during continued questioning after defendant had invoked his *Miranda* rights. The court nevertheless found the statement admissible for the limited purpose of impeachment under *May, supra,* 44 Cal.3d 409, and concluded that its probative value for that purpose outweighed any possible prejudice to defendant. On rebuttal, Detective Stroup testified he contacted defendant at the hospital at approximately 5:30 p.m. on November 3, 1986, asked him about the van, and that defendant stated he had rented it from a person named "Edwin" and did not know the whereabouts of the van's owner.

Defendant challenges the admission of the statement on a number of grounds. He emphasizes that his statement that he rented the van from a

person named Edwin "obviously was untrue," although he concedes the extrajudicial statement conflicted with his direct testimony at trial that he found the van in the motel parking lot with Jones already strangled inside. Defendant argues the statement "was not relevant for admissibility under the *May* and *Harris* test because the statement was not incriminating in the required sense." By this he means the statement "was not impeaching because it was untrue, was not inculpatory, and was contrary to both the prosecution's and the defense theories of the case as presented to the jury."

First, there is no requirement that extrajudicial statements ruled inadmissible under *Miranda* must be truthful in order for them to be available for the limited purpose of impeachment under *Harris*. "The *Harris* court held that statements made to police under circumstances rendering them inadmissible under *Miranda* in the prosecution's case in chief could be admitted for purposes of impeachment of a testifying defendant whose trial testimony was inconsistent with the earlier statements." (*May, supra,* 44 Cal.3d at p. 315; see *Harris, supra,* 401 U.S. at p. 226 [91 S.Ct. at p. 646].) Here, the impeachment value of defendant's extrajudicial statement, whether true or not, was that it contradicted his testimony at trial and thereby bore upon the credibility of that testimony. In his closing argument, the prosecutor urged the jury to find that because defendant lied when he told police he rented the van from a man named Edwin, his conflicting story at trial—that he was involved in an attempted drug buy with Jones at a motel, and that he found the van in the motel parking lot with Jones's already strangled body inside—should likewise be disbelieved.

Defendant's remaining claims respecting the admissibility of the statement for impeachment purposes are likewise unavailing. He argues that his statement was involuntary and thus excludable for all purposes, including impeachment. (See *Michigan v. Harvey* (1990) 494 U.S. 344, 350-351 [110 S.Ct. 1176, 1180-1181, 108 L.Ed.2d 293].) We have independently reviewed the record and find that the prosecution proved that the statement was voluntary by a preponderance of the evidence. (*People v. Badgett* (1995) 10 Cal.4th 330, 348 [41 Cal.Rptr.2d 635, 895 P.2d 877]; *People v. Thompson* (1990) 50 Cal.3d 134, 166 [266 Cal.Rptr. 309, 785 P.2d 857].) Detective Stroup's representation to defendant that the statement would not be used against him in court for any purpose complicates the matter somewhat, because the statement *was* ultimately used for impeachment. Regarding the question of whether the detective's representation rendered defendant's statement involuntary, the trial court found that Detective Stroup was simply being truthful, in that he was unaware at the time that Jones was the van's owner, much less that she had been killed and her body secreted in the van. The court found it significant that since Detective Stroup was investigating

the Stopher murder, and since defendant had halted the questioning about that crime in the first interview, the detective was simply conveying to defendant that any information defendant furnished about the van would not be used against him in the Stopher case, in which questioning had just been terminated at defendant's request.

Although Detective Stroup may not have harbored a subjective belief that any statement defendant made would be used against him in a prosecution for the murder of Jones—since the detective had no knowledge of Jones's murder at the time—the voluntariness inquiry is, of course, concerned with *defendant's* subjective state of mind at the time of the questioning, not that of Detective Stroup. In that regard, defendant was plainly told that his statement would not be used against him in court for any purpose. The legal circumstance that the statement ultimately *was* used against him in court for the limited purpose of impeachment under *Harris* and *May* does not bear directly on the inquiry of whether the statement *was voluntary at the time it was made*. It is the fact that defendant was told any information he furnished about the identity or whereabouts of the van's owner would not be used against him in court, and his possible reliance on that representation in making the statement that he rented the van from a person named Edwin, that does, of course, bear on the voluntariness inquiry. The matter is further complicated because we know in hindsight that the information defendant furnished about the van's owner, in actuality, was not true, a matter conceded by defendant. In short, from the standpoint of voluntariness, Detective Stroup's representation to defendant, that any information he furnished about his acquisition of the van would not be used against him in court, did *not* motivate defendant to reveal truthful and incriminating information, thereby possibly rendering such disclosures involuntary.

In sum, although we disagree with the trial court's specific conclusion that Detective Stroup's state of mind in making the representation to defendant precludes a finding of involuntariness, the circumstance that the statement was ultimately and lawfully admitted against defendant in court for the limited purpose of impeachment does not alter our conclusion that the prosecution proved the *voluntariness* of the statement by a preponderance of the evidence. (*People v. Badgett, supra,* 10 Cal.4th at p. 348; *People v. Thompson, supra,* 50 Cal.3d at p. 166.) In any event, even assuming arguendo it was error to admit the statement for impeachment purposes given Detective Stroup's representation at the time it was made that it would not be used in court, the error was clearly harmless beyond a reasonable doubt. (*People v. Cahill* (1993) 5 Cal.4th 478, 487, 509-510 [20 Cal.Rptr.2d 582, 853 P.2d 1037]; see *Arizona v. Fulminante* (1991) 499 U.S. 279, 306-312 [111 S.Ct. 1246, 1262-1266, 113 L.Ed.2d 302].) Defendant concedes that the

statement that he rented the van from a person named Edwin was not true; neither was it a confession, an incriminating admission, or other substantive evidence of guilt. The only possible prejudice would flow from the impeachment value of the statement, but defendant's credibility was already in serious question at trial. Defendant testified, "I was lying throughout the trial proceedings of my son"; he testified he lied to his brother-in-law Lostanau; he testified he initially lied to Joseph about his intentions in going to Hesperia; he testified he lied to Officer Dunavent when stating upon being stopped that he was on his way home; and he testified he had lied to his second wife, Rose V., about his relationship or affair with Jones. There was strong physical evidence pointing to defendant as Jones's murderer, including that a garrote he admittedly made was found wrapped around her neck; that he secreted her body in the van and drove the vehicle across county lines; that he had a motive for the killing (use of Jones's van to accomplish the Stopher murder and Rose V. kidnapping); and that after his arrest he made an admission of awareness that he had killed two persons (i.e., Stopher and Jones). On this record it is clear beyond a reasonable doubt that impeachment with defendant's extrajudicial statement that he rented the van from a person named Edwin did not prejudice his conviction of Jones's murder.

 Defendant also complains that the giving of CALJIC No. 2.13, which instructs the jury, inter alia, that it can consider a prior inconsistent statement, not only for impeachment, "but also as evidence of the truth of the facts as stated by the witness on such former occasion," permitted the jury to consider the statement for other than mere impeachment, in contravention of the *Miranda* ruling below. The short answer is that a limiting admonition was never requested, nor was the trial court under a sua sponte obligation to give one. (See Evid. Code, § 355; *People v. Torrez* (1995) 31 Cal.App.4th 1084, 1088 [37 Cal.Rptr.2d 712].) In any event, since the statement was neither a confession nor an admission and defendant concedes the statement was not true, there was no substantive, much less prejudicial, use to which the jury could have put the statement, even had the jury improperly applied CALJIC No. 2.13.

Since use of the statement for impeachment or any other purpose could not in logic have prejudiced defendant's conviction of Jones's murder, his related claims of prosecutorial misconduct and ineffective assistance of counsel in connection with the admission of the statement and the giving of CALJIC No. 2.13 without a limiting instruction must be likewise be rejected.

### 3. *Exclusion of third party culpability evidence*

 Defendant contends the trial court erred when it made a ruling excluding any third party culpability evidence regarding the murder of

Jones. Defendant also urges that the trial court precluded submission of this defense to the jury when it rejected the following requested instruction: "As an established principle, a defendant may show another person committed the crime and that he himself is innocent." We find no error.

The issue of third party culpability evidence first surfaced when the prosecution sought a ruling prior to jury voir dire excluding any such evidence. The motion was denied without prejudice at that time. The matter resurfaced in anticipation of references to such evidence in defendant's opening statement, which was never forthcoming, and became the subject of a full hearing pursuant to *People v. Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99] (*Hall*) at the close of the People's case-in-chief.

At the hearing, the defense presented the testimony of three witnesses. Defendant testified he had personal knowledge that Jones dealt in marijuana and other narcotics from the time he first met her in 1984. He testified Jones owed a large sum of money to a drug dealer from a prior transaction, that she was putting together a drug transaction for late in the evening of October 30, 1986, and that she enlisted his services to protect her during the meeting. Defendant was to be armed and await any indication she might be in trouble. Defendant testified he obtained weapons from his brother-in-law's house, that Jones purchased ammunition for the weapons, and that they met a Mexican man named Pablo at the arranged time on the evening of October 30. The drugs never arrived. Instead, the transaction was postponed and Jones and Pablo drove defendant to his first wife's house to speak with his son Joseph, then dropped defendant off at the Bakersfield motel where he stayed alone in a room that night. Defendant never saw Pablo again. He did, however, call and speak with Jones on the telephone the following morning, October 31, and she was all right at that time. He thereafter came upon her van parked in the motel parking lot later that same afternoon, and found Jones dead inside, with the garrote, which he admittedly had made, tied around her neck.

A second witness, Vickie Boen, testified she was an employee at Longs Drugs in Bakersfield on October 30, 1986, and that she sold ammunition for a shotgun, a .380-caliber pistol, and a rifle to Jones near closing time (9:30 p.m.) on that date.

The third witness at the *Hall* hearing, Jones's daughter Sheva Jones, testified that on several prior occasions her mother had bought some marijuana, and twice split it with her friends. Once she saw a balloon on her mother's dresser that her mother said contained drugs. She could not remember telling Detective Knapp that shortly before October 31, 1986, her mother

said she was going to be involved in a drug transaction. Defense counsel also indicated he had three additional witnesses who were not available to testify at the hearing: Detective Knapp, who would testify to statements Sheva made to him about her mother's involvement with drug trafficking; a second unidentified witness, who would testify he had seen Billie Faye Jones dealing marijuana and cocaine; and a third unidentified witness, who would testify he had bought narcotics from Jones.

.The trial court, relying on *Hall*, agreed that a criminal defendant has a right to present evidence of third party culpability where such evidence is capable of raising a reasonable doubt as to his guilt of the charged crime. However, the court went on to observe that, as this court explained in *Hall*, "[W]e do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Hall, supra,* 41 Cal.3d at p. 833.) Moreover, once evidence of this type has been found relevant and admissible, the court may nonetheless exercise discretion under Evidence Code section 352 to exclude it where its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion. (*Hall,* at p. 834.)

The trial court agreed the defense could present evidence pertaining to Jones's alleged drug dealings. The court, however, was concerned about the hearsay nature of the testimony described in defense counsel's offer of proof, and determined that such evidence should only be admitted through defendant's own testimony. As for whether there was sufficient evidence to raise a reasonable doubt that a third party actually killed Jones, the court noted the evidence at best showed only that, according to defendant, Jones and one "Pablo" had been together on the evening of October 30, but that it was also established that Jones was alive, well, and at home on the following morning, October 31. Indeed, defendant himself testified he spoke with Jones on the phone that next morning at her home, and that she had indicated she was okay. Because there was no evidence that Pablo or any other identifiable suspect was with Jones from the time she was last seen, at approximately 1:00 p.m. on October 31, until defendant allegedly found her dead in her van at approximately 2:30 p.m. that same afternoon, a foundation for admission of third party culpability evidence was not established.

We agree with respondent that the trial court's ruling under *Hall* was correct. We acknowledge that defendant testified Jones had told him a meeting about the drug transaction was going to occur on October 30 *or* 31,

but there was no direct or circumstantial evidence to link Pablo or any other identifiable third party with Jones in the hours before her death, or indeed on the date of her death. Although defendant's testimony may have raised a suggestion that Pablo or some other third party involved in drug trafficking had a motive or possible opportunity to murder Jones, additional direct or circumstantial evidence was required to link Pablo or some other third party to the actual perpetration of the crime. (*Hall, supra,* 41 Cal.3d at p. 833.)

We observe that the trial court did permit defendant to testify at trial, consistent with his testimony at the *Hall* hearing, about Jones's past involvement in narcotics dealings, and about the asserted aborted transaction that had been scheduled to occur on the evening prior to her murder. Indeed, the trial court indicated it would overrule any objection by the prosecutor to such testimony on mere grounds that it would encompass "drug culture, drug dealings, things of that sort." But the trial court properly found that there was no evidence, beyond mere speculation, that Pablo or some other third party either had been present with Jones on the day of her murder or had been shown to be connected to the crime in some other way. And the court was further within its discretion under Evidence Code section 352 in concluding that the probative value of the proffered evidence, other than defendant's own testimony (which was allowed), was outweighed by the potential prejudice and confusion it would likely engender. We have in past cases upheld the exclusion of third party culpability evidence under analogous circumstances. (See *People v. Kaurish* (1990) 52 Cal.3d 648, 684-686 [276 Cal.Rptr. 788, 802 P.2d 278] [mere evidence of third party's anger toward victim was insufficient basis to admit evidence linking him to crime]; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1017-1018 [254 Cal.Rptr. 586, 766 P.2d 1] [third party's possible motive alone insufficient to raise reasonable doubt of defendant's guilt].)

Defendant's further argument that the trial court erred in rejecting his requested special instruction likewise must fail. The instruction would have told the jury, "As an established principle, a defendant may show another person committed the crime and that he himself is innocent." The instructions given to the jury did not prevent them from considering any aspect of defendant's testimony. Refusal of the proffered special instruction was proper given the court's ruling that third party culpability evidence, other than defendant's own testimony, was being excluded under *Hall* and Evidence Code section 352. Moreover, the proffered instruction was confusing to the extent it purported to address defendant's "innocence," since the jury was also properly instructed, in accordance with CALJIC No. 2.90, that defendant was presumed innocent until proven guilty, and that the burden of proving guilt fell to the prosecution.

### 4. *Evidentiary rulings: admission of evidence of threats; impeachment with prior conviction; cross-examination of defense expert witness*

Defendant contends that several other evidentiary rulings deprived him of a fair trial and prejudiced the guilty verdicts, requiring reversal. None of the rulings, in our view, constituted error, prejudicial or otherwise.

Over defendant's objection, Rose V. was permitted to testify in the prosecution's case-in-chief that several times during their marriage defendant told her he did not like police officers and wanted to kill or "blow one away." The testimony was admitted as probative of defendant's state of mind in attempting to kill Officer Dunavent. Thereafter, defendant testified on direct examination that he did not intend to kill Officer Dunavent and did not remember putting a gun to his head. He also denied on cross-examination that he hated police officers or wanted to kill them, and testified he had never made any threats to kill law enforcement officers. Accordingly, the prosecution was permitted to call Deputy Shafia on rebuttal to testify that on April 26, 1990, at the San Bernardino County jail, defendant told the deputy he wanted to "take out," i.e., kill, a deputy. The court specifically found the probative value of the evidence outweighed its potential for prejudice under Evidence Code section 352.

 Defendant challenges these rulings, claiming the statements made to Rose V. were too remote in time, that the statement made to Deputy Shafia was not probative because it was made while he was awaiting trial, and that all such evidence merely portrayed him as a bad or violent person. The objections were properly overruled. The evidence was manifestly admissible to show defendant's state of mind in attempting to murder Officer Dunavent. (*People v. Rodriguez* (1986) 42 Cal.3d 730, 757-758 [230 Cal.Rptr. 667, 726 P.2d 113] [threats and statements of contempt for police]; *People v. Karis* (1988) 46 Cal.3d 612, 637-638 [250 Cal.Rptr. 659, 758 P.2d 1189] [threat to kill those who would send defendant back to prison].) Nor, with regard to defendant's statement to Deputy Shafia that he wanted to kill a deputy, does it matter that the statement was made after the instant crimes. (*People v. Johnson* (1993) 6 Cal.4th 1, 33-34 [23 Cal.Rptr.2d 593, 859 P.2d 673].) The trial court was within its sound discretion in overruling defendant's objections and admitting the evidence. (*People v. Alvarez, supra,* 14 Cal.4th at pp. 214-215.)

Defendant contends the trial court erred in ruling that he could be impeached with his 1984 prior conviction of assault with a deadly weapon (vehicle) on a peace officer. He concedes the prior conviction was for a crime of moral turpitude, but urges it was excludable as too similar to the

crime with which he was charged, the attempted murder of Officer Dunavent. The claim is specious. In cross-examining Rose V. in order to establish that she had betrayed defendant while he was in prison by entering into a relationship with Stopher, defense counsel expressly requested the trial court to reverse its prior ruling and rule admissible for impeachment purposes the 1984 prior conviction. Pursuant to the request, the court determined the prior conviction was a crime of moral turpitude and expressly found that its probative value outweighed potential prejudice under Evidence Code section 352. Thereafter, contrary to defendant's assertions, it was defense counsel who, in questioning V., proceeded to first elicit before the jury the fact that defendant had been in prison *and* that he had served time for assault on a peace officer. The doctrine of invited error bars defendant from challenging the ruling on appeal. (*People v. Cooper* (1991) 53 Cal.3d 771, 827-828 [281 Cal.Rptr. 90, 809 P.2d 865].) Moreover, as a substantive matter, the ruling admitting the prior conviction for impeachment purposes was not error, even though the prior offense was similar in some respects to the charged attempted murder of Officer Dunavent. (*People v. Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111]; see *People v. Tamborrino* (1989) 215 Cal.App.3d 575, 590 [263 Cal.Rptr. 731] [robbery priors identical to charged offense].)

■ Defendant next complains of the admission of the rebuttal testimony of nurse Violet Garday. After a hearing pursuant to Evidence Code section 402, subdivision (b), the trial court overruled defendant's objection to the testimony of Garday, the head nurse at the San Bernardino County jail, regarding her opinion of defendant's reputation for honesty. Defendant objected on the ground that he had not elicited reputation evidence, and therefore Evidence Code section 1102 precluded the prosecution from attacking his veracity. Garday testified on rebuttal that as the head nurse she knew defendant while he was in the San Bernardino County jail; he was housed in the infirmary for nearly three years, during which period she had daily contact with him. Based upon her contacts with him and discussions with other nursing staff, it was Garday's opinion that defendant had a reputation for dishonesty.

By taking the stand, defendant put his own credibility in issue and was subject to impeachment in the same manner as any other witness. Moreover, the record reflects that defendant's own expert witness, Dr. Pursich, testified on direct examination that in his opinion defendant was honest. Garday's rebuttal testimony that defendant had a reputation for dishonesty was properly ruled admissible. (See *People v. Harris* (1989) 47 Cal.3d 1047, 1081 [255 Cal.Rptr. 352, 767 P.2d 619].)

Defendant also contends Garday gave what amounts to impermissible expert opinion testimony when she was asked on rebuttal, "Based on your

contact with [defendant] on almost a daily basis for several years, have you seen any signs that he's brain-damaged or has something wrong with his brain or mind?" Garday replied, "No sir." As defendant concedes, there was no objection to the question or answer. Accordingly, the claim of error has not been preserved on appeal. (Evid. Code, § 353, subd. (a); *People v. Alvarez, supra,* 14 Cal.4th at p. 186.) In any case, Garday was asked if, in her capacity as defendant's daily nurse for a number of years, she had "seen any signs" that defendant was brain damaged or had something wrong with his mind—*not* whether it was her opinion that defendant was brain damaged. The specific question posed was subject to a layperson's answer by someone with the length of contacts that Garday had with defendant. Accordingly, defendant's alternative claim that counsel rendered ineffective assistance in failing to object must be rejected; counsel undoubtedly realized an objection would have been unavailing.

### 5. *Felony murder as a theory of Stopher's murder (count II)*

Defendant was charged with Stopher's murder in count II. The jury was instructed on three theories of first degree murder in connection with Stopher's murder: premeditated and deliberate murder, murder by lying in wait, and first degree felony murder, with the underlying felony being the burglary charged in count III. Count III charged defendant with the residential burglary of Rose V.'s house. Five target felonies were alleged in connection with the burglary charge: assault with a deadly weapon or firearm upon Rose V.; corporal injury to a spouse; false imprisonment by violence, menace, fraud, or deceit; kidnapping; and forcible rape.[7]

Defendant contends that as a matter of law the felony-murder theory was inapplicable to the murder of Stopher, and that it was prejudicial error to instruct the jury on felony murder in connection with that crime. His argument is that his killing of Stopher was intentional, and hence the murder was not a negligent or accidental consequence of the predicate burglary, which as charged was directed at victim Rose V. In so arguing defendant misconstrues felony-murder law.

" '[A]ll murder . . . which is committed in the perpetration of, or attempt to perpetrate,' certain enumerated felonies, including [burglary], 'is murder of the first degree . . . .' (Pen. Code, § 189.) The mental state required is simply the specific intent to commit the underlying felony;

---

[7]Notably, Stopher's murder was not alleged as a target offense of the burglary charged in count III. Had the independent target offenses not been alleged in connection with the burglary charge, the merger doctrine might have applied. (See *People v. Wilson* (1969) 1 Cal.3d 431, 439-442 [82 Cal.Rptr. 494, 462 P.2d 22].)

neither intent to kill, deliberation, premeditation, nor malice aforethought is needed. (See, e.g., *People* v. *Coefield* (1951) 37 Cal.2d 865, 868-869 [236 P.2d 570]; see, generally, 1 Witkin & Epstein, Cal. Criminal Law [(2d ed. 1988)] Crimes Against the Person, § 470, p. 528; see also *People* v. *Hernandez* (1988) 47 Cal.3d 315, 346 [253 Cal.Rptr. 199, 763 P.2d 1289].) There is no requirement of a strict 'causal' (e.g., *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1016 [248 Cal.Rptr. 568, 755 P.2d 1017]) or 'temporal' (e.g., *People* v. *Hernandez, supra*, 47 Cal.3d at p. 348) relationship between the 'felony' and the 'murder.' All that is demanded is that the two 'are parts of one continuous transaction.' (E.g., *People* v. *Ainsworth, supra*, 45 Cal.3d at p. 1016; see, e.g., *People* v. *Hernandez, supra*, 47 Cal.3d at p. 348.)" (*People v. Berryman* (1993) 6 Cal.4th 1048, 1085 [25 Cal.Rptr.2d 867, 864 P.2d 40].)

The evidence reflects that defendant killed Stopher during the perpetration of the burglary of Rose V.'s residence—the burglary and murder were "parts of one continuous transaction." (*People v. Ainsworth, supra*, 45 Cal.3d at p. 1016.) Rose V. testified that when she answered the doorbell defendant and his son shoved open the door and pushed her to the floor. Joseph, wearing a Halloween mask, placed a handgun to Rose V.'s head; when she screamed to warn Stopher she was ordered to shut up. Joseph stayed in the living room guarding Rose V. with a handgun while defendant forced his way through the locked door of the master bathroom and fatally shot Stopher with the 12-gauge shotgun. There is no suggestion that any appreciable time elapsed between the time defendant and Joseph forced their entry into Rose V.'s home and subdued her and defendant's forcible entry into the master bathroom where he killed Stopher. Indeed, defendant observes in his opening brief that the killing of Stopher "coincided with the burglary."

Defendant's assertion that his intentional killing of Stopher was unrelated to the burglary perpetrated with reference to Rose V. is therefore meritless, and his lengthy discourse on why the felony-murder instructions should be found prejudicial is unavailing. He further urges that felony murder is inapplicable "where the independent intent to kill exists prior to or coincides with the commission of the predicate felony, [because] the killing is not committed during commission of the felony." Putting aside the fact that defendant claimed at trial he did not harbor intent to kill Stopher when he first entered the residence, it is clear that concurrent intent to kill and to commit the target felony or felonies does not undermine the basis for a felony-murder conviction. (See, e.g., *People v. Clark* (1990) 50 Cal.3d 583, 607-609 [268 Cal.Rptr. 399, 789 P.2d 127]; *People v. Murtishaw* (1981) 29 Cal.3d 733, 752 [175 Cal.Rptr. 738, 631 P.2d 446].)

Felony murder was a viable theory of Stopher's murder and the jury was properly instructed as much.

### 6. *Refusal of pinpoint voluntary manslaughter instruction*

The trial court gave the standard instructions on voluntary manslaughter and the requisite provocation necessary to reduce murder to manslaughter. Defendant argues the court erred in refusing to additionally give three pinpoint manslaughter instructions proposed by the defense.

The first, entitled "Manslaughter," would have told the jury, "When the charge is intentional murder (as distinguished from felony murder), evidence that the defendant committed the homicide in a heat of passion, or evidence that by reason of mental disease, mental defect or intoxication he lacked capacity to harbor malice, may form the basis for a voluntary manslaughter verdict."

The second, entitled "Manslaughter: Heat of Passion Defined," would have told the jury, "The term 'passion' as used in the phrase 'heat of passion' need not mean rage or anger, but may be any violent, intense, high-wrought, or enthusiastic emotion, other than a passion for revenge, and includes a 'passion' which might be induced by a victim's long-continued provocating [*sic*] conduct which causes a 'long smoldering resentment' on the part of the defendant towards the victim."

The third, entitled "Manslaughter: Verbal Provocation," would have told the jury, "To satisfy the objective or 'reasonable person' element of voluntary manslaughter, the accused's heat of passion must be due to sufficient provocation. Verbal provocation may be sufficient."

The first instruction was, of course, properly rejected insofar as it misstated the law by invoking the defense of diminished capacity, which had been abolished by the Legislature. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1013-1014 [68 Cal.Rptr.2d 648, 945 P.2d 1197]; *People v. Saille* (1991) 54 Cal.3d 1103, 1114 [2 Cal.Rptr.2d 364, 820 P.2d 588].)[8] The court refused the remaining two requested instructions, finding the standard instructions on voluntary manslaughter fully and adequately advised the jury on provocation and heat of passion.

A criminal defendant is entitled, on request, to instructions that pinpoint the theory of the defense case. (*People v. Saille, supra,* 54 Cal.3d at p. 1119; *People v. Wright* (1988) 45 Cal.3d 1126, 1137 [248 Cal.Rptr. 600, 755 P.2d 1049]; *People v. Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d

---

[8]The jury was properly instructed it could consider evidence of defendant's mental defect or disorder to determine whether he actually formed the mental state required for specified crimes, including murder and manslaughter. (See CALJIC No. 3.32.)

847].) Here, defendant's second requested instruction, entitled "Manslaughter: Heat of Passion Defined," appears to be derived from language in our past decisions. (See, e.g., *People v. Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777]; *People v. Borchers* (1958) 50 Cal.2d 321, 329 [325 P.2d 97]; see also *People v. Steele* (2002) 27 Cal.4th 1230, 1251-1254 [120 Cal.Rptr.2d 432, 47 P.3d 225] (*Steele*) [rejecting claim that similar pinpoint instruction should have been given because evidence failed to support giving of any heat of passion instruction].) Some Courts of Appeal have concluded a trial court should not give such an instruction on request; others have determined such an instruction can and should be given if requested. (See, e.g., *People v. Rupe* (1988) 206 Cal.App.3d 1537, 1540-1542 [256 Cal.Rptr. 126] [instruction should not be given even if requested]; cf. *People v. Thompkins* (1987) 195 Cal.App.3d 244, 256-257 [240 Cal.Rptr. 516] [instruction permitted]; see *Steele, supra,* 27 Cal.4th at p. 1252.) In *People v. Wharton* (1991) 53 Cal.3d 522 [280 Cal.Rptr. 631, 809 P.2d 290], this court found it error to refuse a requested pinpoint manslaughter instruction, explaining that "legally adequate provocation could occur over a considerable period of time," although in *Wharton* the error was found harmless. (*Id.* at pp. 571-572.)

■ As explained in *Steele, supra,* 27 Cal.4th at pages 1252-1253, however: "Since its adoption in 1872, section 192, subdivision (a), has described voluntary manslaughter as the unlawful killing 'upon a sudden quarrel or heat of passion.' . . . Also since its adoption in 1872, section 188 has stated that malice is implied 'when no considerable provocation appears.' (See *People v. Williams* (1969) 71 Cal.2d 614, 623-624 [79 Cal.Rptr. 65, 456 P.2d 633].) Under this language, '[e]vidence of adequate provocation overcomes the presumption of malice.' (*Id.* at p. 624.) Accordingly, for voluntary manslaughter, 'provocation *and* heat of passion must be affirmatively demonstrated.' (*People v. Sedeno* (1974) 10 Cal.3d 703, 719 [112 Cal.Rptr. 1, 518 P.2d 913]; see also *People v. Breverman* (1998) 19 Cal.4th 142, 163 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

"The heat of passion requirement for manslaughter has both an objective and a subjective component. (*People v. Wickersham* (1982) 32 Cal.3d 307, 326-327 [185 Cal.Rptr. 436, 650 P.2d 311].) The defendant must actually, subjectively, kill under the heat of passion. (*Id.* at p. 327.) But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago in interpreting the same language of section 192, 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless

further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' (*People v. Logan* (1917) 175 Cal. 45, 49 [164 P. 1121].)" (*Steele, supra,* 27 Cal.4th at pp. 1252-1253.)

"To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.'" (*People v. Wickersham, supra,* 32 Cal.3d at p. 326.)

 Although the trial court in this case instructed the jury on heat of passion voluntary manslaughter, it clearly did so out of an abundance of caution, as the evidence, in our view, arguably could not satisfy the requirement of provocation. Defendant planned the trip to Hesperia and outfitted himself with the weapons and items he would need to surprise his victims and ensure their demise. He calmly waited in Jones's van in the vicinity of Rose V.'s residence until Rose V. and Stopher returned home. He gained entry to the home by ruse, quickly subdued his second wife, proceeded directly to the master bathroom, broke down the locked door, and fatally shot Stopher, who was in the shower, with several shotgun blasts. If anything, defendant appears to have acted out of a *passion for revenge*, which will not serve to reduce murder to manslaughter. Although the defense evidence was probative of whether defendant *subjectively* killed in the heat of passion, from an objective standpoint, the evidence arguably did not establish the requisite provocation necessary for conviction of voluntary manslaughter, rather than murder. Since defendant was given the benefit of the doubt and standard manslaughter instructions were given, the court did not have to give yet additional instructions on the point. (*People v. Perez* (1992) 2 Cal.4th 1117, 1129-1130 [9 Cal.Rptr.2d 577, 831 P.2d 1159].)

Beyond that, the standard manslaughter instructions given adequately covered the valid points in the proposed pinpoint manslaughter instructions. (See CALJIC Nos. 8.40 [voluntary manslaughter defined], 8.42 [sudden quarrel or heat of passion and provocation defined], 8.43 [defining cooling-off period], 8.44 [no one specific emotion alone constitutes heat of passion], and 8.50 [distinguishing murder from manslaughter].) Most importantly, even were we to conclude on this record that a pinpoint instruction should have been given explaining that legally adequate provocation can occur over a considerable period of time, the error would be harmless, as "nothing in [the standard instructions given] *precluded* the jury from finding adequate provocation resulting from conduct occurring over a considerable period of time," and counsel's argument to the jury fully explicated the defense theme of long-standing provocation in connection with the Stopher murder charge.

(*People v. Wharton, supra,* 53 Cal.3d at p. 572.) For the same reasons, it was not error to refuse to specially instruct the jury that words themselves can constitute sufficient provocation—the essence of defendant's third requested and rejected pinpoint instruction.

### 7. *Refusal of involuntary manslaughter instructions*

Defendant contends the trial court erred in refusing his request that the jury be instructed on involuntary manslaughter in connection with Stopher's murder. Section 192, subdivision (b), defines involuntary manslaughter as the unlawful killing of a human being without malice "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. . . ." Defendant's theory below was that the jury could have found he brandished the murder weapon (the shotgun), a misdemeanor (§ 417, subd. (a)(2)), and thereby found that he killed Stopher in the commission of an unlawful act not amounting to felony—i.e., misdemeanor brandishing of a firearm.

Generally, involuntary manslaughter is a lesser offense included within the offense of murder. (*People v. Prettyman* (1996) 14 Cal.4th 248, 274 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) Due process requires that the jury be instructed on a lesser included offense *only* when the evidence warrants such an instruction. (*Hopper v. Evans* (1982) 456 U.S. 605, 611 [102 S.Ct. 2049, 2052-2053, 72 L.Ed.2d 367]; *People v. Avena* (1996) 13 Cal.4th 394, 424 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; *People v. Kaurish, supra,* 52 Cal.3d at p. 696.) Refusal to instruct on involuntary manslaughter in connection with the murder of Stopher was manifestly not error on these facts. At trial, defendant testified he "fired" the shotgun at Stopher because Stopher "took [his] life." In his opening brief before this court, defendant observes that "the shooting of Stopher . . . resulted from intentional conduct of [defendant] directed at Stopher as the objective. . . ." The trial court correctly concluded the evidence did not warrant instruction on involuntary manslaughter. Even were it otherwise, the fact that the jury rejected manslaughter and found defendant guilty of the first degree murder of Stopher precludes any possible error in the refusal to instruct on involuntary manslaughter. (*People v. Prettyman, supra,* 14 Cal.4th at p. 276.)

### 8. *Prosecutorial misconduct (guilt phase)*

Defendant complains of four alleged instances of prosecutorial misconduct at the guilt phase. "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial." (*People v. Dennis* (1998) 17

Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) "Whether the inferences the prosecutor draws are reasonable is for the jury to decide." (*Ibid.*) In order to preserve a claim of prosecutorial misconduct for appeal, the defense must make a timely objection at trial and request an admonition. (*People v. Earp* (1999) 20 Cal.4th 826, 858 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].) In the absence of a timely objection the claim is reviewable only if an admonition would not have otherwise cured the harm caused by the misconduct. (*People v. Earp, supra,* 20 Cal.4th at p. 858.)

■ Defendant first urges us to find misconduct in the prosecutor's cross-examination of defense witness Kay Zenk. Zenk testified her husband and defendant participated together in an alcohol- and drug-treatment program at a Veterans Administration hospital in 1984. At that time she learned defendant would be going to prison. Thereafter, Zenk and her husband visited defendant in prison. Zenk testified defendant cared very much for his daughter and had a good relationship with his wife, Rose V., but that after the couple was going to get a divorce, defendant changed to a man with no purpose in life whose spirit was gone. In an apparent attempt to rebut the defense suggestion that defendant was a caring and loving husband and father, the prosecutor cross-examined Zenk about the circumstance that defendant never spoke about his other children. When the prosecutor then sought to question Zenk about whether defendant had told her of his belief that Rose V. had given birth to their daughter "just to trap him," and that he did not want the baby and wanted Rose V. to get an abortion, defense counsel's objections to the line of inquiry were sustained. In front of the jury, the court admonished the prosecutor that there was no evidence on the subject matter of his inquiries. The prosecutor asserted he had the evidence, but when he apparently pointed to a document, the court stated "that's not evidence" and cautioned him against "that type of nonsense." A mistrial motion based on the sustained objection was thereafter denied.

Perhaps the prosecutor was alluding to the contents of a letter defendant wrote to Rose V. while he was in prison, or a letter he received from her, because the court immediately told the prosecutor he would be allowed to recall Rose V. on rebuttal to testify directly about the matters he was trying to explore through his cross-examination of Zenk.[9] The prosecutor was of course entitled to seek to rebut the defense's portrayal of defendant as a loving husband and father who would not have killed had Rose V. not

[9]Subsequent to Zenk's testimony, defendant was cross-examined about the circumstances characterizing his marriage to Rose V. prior to his going to prison in 1984. Defendant believed it was Rose V. who accused him of making the statement that she had only gone through with the birth of their daughter in order to trap him.

betrayed him. Nevertheless, it is error to seek to use hearsay as a substitute for properly admitted evidence. But defense counsel's contemporaneous objection to the line of inquiry was sustained, and the jury heard the court admonish the prosecutor that no evidence had been introduced as a foundation for the questions. The prosecutor's transgression was minor, and any possible prejudice was avoided through the admonition given. In light of the properly admitted evidence that already cast serious doubt on defendant's role as a good husband and father (e.g., defendant's self-admitted acts of kidnapping his second wife after killing her lover, and his involving Joseph in the murderous plot and then aiding and abetting him in the rape of Rose V.), the error was harmless.

Defendant next assigns as prosecutorial misconduct questions on cross-examination designed to elicit the fact that he was found in possession of drugs and prescription medications unlawfully obtained by him from other inmates in the county jail. Several objections to this line of inquiry were sustained, others were overruled. Defense counsel again sought a mistrial, arguing the prosecutor's questions regarding defendant's unlawful possession of drugs and medications while in jail had "no relevance to the charges in this case and were designed strictly to embarrass and somehow paint [defendant] in a negative light. . . ." The court ultimately overruled defense counsel's objections and denied the motion for a mistrial. We find no error in the ruling. A prosecutor is permitted wide scope in the cross-examination of a criminal defendant who elects to take the stand. (*People v. Mayfield* (1997) 14 Cal.4th 668, 754 [60 Cal.Rptr.2d 1, 928 P.2d 485].) Defendant testified on direct examination that he used drugs with Jones and was involved in an attempted drug buy that aborted shortly before her death. Defendant thereby opened the door to further inquiry concerning his admitted drug use. In particular, the prosecution could seek to show that defendant's possession and hoarding of drugs and medications while in the county jail was possibly probative on his performance on brain performance tests administered to him by defense expert Dr. Pursich while he was in the county jail. The prosecutor elicited from defendant the fact that he was on Motrin at the time he was interviewed by Dr. Pursich, and that he was found in possession of 74 Dilantin pills, a seizure medication that affects the brain, on August 24, 1989. (Brain function tests were performed on defendant in the latter part of 1989, including an MRI on Nov. 10, 1989.)

Defendant also contends it was misconduct for the prosecutor, on cross-examination, to ask his first wife if defendant had ever beaten her in the past. His first wife, Joseph's mother, testified defendant came to her house on the night of October 30, 1986, in the company of another Hispanic male, that defendant appeared intoxicated, but that she did not fear defendant

at that time. The prosecutor impeached her with her testimony from Joseph's juvenile court trial that she feared defendant on that date. When she claimed she could not recall her prior testimony, the prosecutor asked her if defendant had ever beaten her in the past. At that point a defense objection to the line of inquiry was sustained. We find no prejudicial misconduct. The first wife had also testified in juvenile court that when defendant entered her house on the night of October 30, 1986, he pushed her aside. Moreover, the jury was instructed that counsel's questions are not evidence (CALJIC No. 1.02), and they were already fully aware, from defendant's own testimony, that he had kidnapped Rose V., his second wife, after killing Stopher, her live-in partner, with a shotgun; that he fired shots at Officer Dunavent during the gun battle that led to his arrest; and that he was thus capable of great violence.

Last, defendant argues the prosecutor committed misconduct during cross-examination of Dr. Pursich through "improper belittlement and disparagement" of the defense expert. To the extent defendant failed to object to the specific questions he now assigns as misconduct, he has waived the claim on appeal. In any event, the record reveals no misconduct in the cross-examination of Dr. Pursich. In particular, there was no impropriety in the prosecutor's cross-examining Dr. Pursich in an effort to clarify his direct examination testimony and learn in how many past cases he had testified for the defense and found the defendants to be suffering from brain damage.

### C. Special Circumstance Issues

#### 1. Constitutionality of lying-in-wait special circumstance

Defendant contends the special circumstance of lying in wait is unconstitutional because there is no significant distinction between the theory of first degree murder by lying in wait (i.e., one of the theories of the Stopher murder) and the special circumstance of lying in wait, and that the special circumstance therefore fails to meaningfully narrow death eligibility. We have repeatedly rejected the same contention with respect to analogous facts and circumstances—see, e.g., *People v. Crittenden* (1994) 9 Cal.4th 83, 155 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Sims, supra,* 5 Cal.4th at page 434; *People v. Roberts* (1992) 2 Cal.4th 271, 322-323 [6 Cal.Rptr.2d 276, 826 P.2d 274]; *People v. Wader* (1993) 5 Cal.4th 610, 669 [20 Cal.Rptr.2d 788, 854 P.2d 80]; *People v. Edwards* (1991) 54 Cal.3d 787, 824 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People v. Edelbacher, supra,* 47 Cal.3d at page 1023; *People v. Morales* (1989) 48 Cal.3d 527, 557-558 [257 Cal.Rptr. 64, 770 P.2d 244]—and do so again here.

 "[M]urder by means of lying in wait requires only a wanton and reckless intent to inflict injury likely to cause death. (*People v. Ruiz* (1988)

44 Cal.3d 589, 614 [244 Cal.Rptr. 200, 749 P.2d 854]; *People* v. *Atchley* (1959) 53 Cal.2d 160, 175, fn. 4 [346 P.2d 764] . . . .)" (*People v. Webster* (1991) 54 Cal.3d 411, 448 [285 Cal.Rptr. 31, 814 P.2d 1273].)[10] In contrast, the lying-in-wait special circumstance requires "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . ." (*People v. Morales, supra,* 48 Cal.3d at p. 557; *People v. Carpenter* (1997) 15 Cal.4th 312, 388 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Sims, supra,* 5 Cal.4th at p. 432.) Furthermore, the lying-in-wait special circumstance requires "that the killing take place *during the period of concealment and watchful waiting,* an aspect of the special circumstance distinguishable from a murder perpetrated by means of lying in wait, or following premeditation and deliberation. (*People* v. *Edelbacher*[, *supra,*] 47 Cal.3d 983, 1022 . . . .)" (*People v. Sims, supra,* 5 Cal.4th at p. 434.)

The distinguishing factors identified in *Morales* and *Sims* that characterize the lying-in-wait special circumstance constitute "clear and specific requirements that sufficiently distinguish from other murders a murder committed while the perpetrator is lying in wait, so as to justify the classification of that type of case as one warranting imposition of the death penalty." (*People v. Sims, supra,* 5 Cal.4th at p. 434.)

### 2. *Insufficiency of evidence of lying in wait*

Defendant contends the evidence was insufficient to establish that he murdered Stopher by means of lying in wait (an alternate theory to felony murder and premeditated and deliberate first degree murder under count II) and the related special circumstance finding that he murdered Stopher while lying in wait. We disagree. As in *People v. Carpenter, supra,* 15 Cal.4th at page 388, "[w]e focus on the special circumstance because it contains the more stringent requirements. [(*People v. Ceja* (1993) 4 Cal.4th 1134, 1140, fn. 2 [17 Cal.Rptr.2d 375, 847 P.2d 55].)] If, as we find, the evidence supports the special circumstance, it necessarily supports the [lying-in-wait] theory of first degree murder."

Viewing the evidence in the light most favorable to the judgment, as we must, the evidence showed defendant planned the trip to Hesperia and

---

[10]This is so because lying in wait as a theory of murder is "the functional equivalent of proof of premeditation, deliberation and intent to kill" (*People v. Ruiz, supra,* 44 Cal.3d at p. 614, and cases cited; see § 189); hence, "a showing of lying in wait obviates the necessity of separately proving premeditation and deliberation . . . ." (*People v. Hardy* (1992) 2 Cal.4th 86, 162 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

that he intended to do harm to both Stopher and Rose V. It further showed he and Joseph waited in Jones's van for up to several hours while parked on a hill close to the Montrose Street house, waiting for Rose V. and Stopher to come home. Indeed, defendant managed to converse with a member of the Hesperia Fire Department, who had approached them while they were parked in the van to inquire about a report of children playing in the area with fireworks, without disclosing his true murderous intentions. When Rose V. and Stopher finally arrived home, defendant and Joseph surprised Rose V. by wearing masks (it was Halloween) to gain easy entry into the home by ruse. Once inside, defendant wasted no time in subduing Rose V., directing Joseph to hold a gun to her head, and proceeding straight to the master bathroom where he broke down the locked door and fatally shot Stopher, who was in the shower, with several shotgun blasts to the head and torso.[11]

We find the evidence plainly established that defendant intentionally murdered Stopher under circumstances that included a concealment of purpose, a substantial period of watching and waiting for an opportune time to act, and, immediately thereafter, a surprise attack on his unsuspecting victims from a position of advantage. (*People v. Morales, supra,* 48 Cal.3d at p. 557.)

### 3. *Cumulative effect of guilt phase and special-circumstance-phase errors*

Defendant contends that even if we find no individual error in the guilt phase to have been prejudicial, the cumulative effect of all the errors he has identified requires reversal. (See, e.g., *People v. Hill, supra,* 17 Cal.4th at pp. 844-845.) Having found no prejudicial error at the guilt phase, there is no cumulative prejudice to assess.

### D. *Penalty Phase Issues*

### 1. *Constitutionality of California death penalty statute*

Defendant urges that California's death penalty law violates the Fifth, Eighth and Fourteenth Amendments to the federal Constitution because (1) section 190.3, factors (a) and (b) are unconstitutionally vague, (2) there is no guidance regarding which circumstances are aggravating and which are

---

[11]Although defendant testified that when he broke through the bathroom door with shotgun in hand Stopher began screaming at him to get out of the house, and threatening him, the trial court later astutely observed, in the course of denying the automatic motion to modify the death verdict, that the photographs of the murder scene revealed only one of the sliding glass shower doors had been shattered by the gun blasts, leading to an inference that Stopher was showering behind the closed glass doors when defendant first opened fire.

mitigating, (3) irrelevant factors are not deleted, leading jurors to believe that the absence of mitigating factors is itself aggravating, (4) the jury is not required to make findings on which factors it is relying upon to impose death, (5) the jury is not required to unanimously agree on applicable aggravating factors, and (6) there is no requirement that death be found appropriate beyond a reasonable doubt. Defendant acknowledges we have in past cases rejected each of these challenges to this state's death penalty statute. We do so again here, finding no reason to reconsider those prior decisions.

Defendant's claim that the death penalty law is unconstitutional because section 190.3, factors (a) and (b) are unconstitutionally vague has been repeatedly rejected by this court. (See, e.g., *People v. Jackson, supra,* 13 Cal.4th at p. 1246; *People v. Hawkins* (1995) 10 Cal.4th 920, 964 [42 Cal.Rptr.2d 636, 897 P.2d 574]; see also *Tuilaepa v. California* (1994) 512 U.S. 967 [114 S.Ct. 2630, 129 L.Ed.2d 750].) His claim that the death penalty law is unconstitutional because there is no guidance regarding which circumstances are aggravating and which are mitigating has likewise been rejected by this court. (See, e.g., *People v. Mayfield, supra,* 14 Cal.4th at p. 806; *People v. Raley* (1992) 2 Cal.4th 870, 919 [8 Cal.Rptr.2d 678, 830 P.2d 712].) His claim that the death penalty law is unconstitutional because irrelevant factors are not deleted, leading jurors to believe that the absence of mitigating factors is itself aggravating, has repeatedly been rejected. (See, e.g., *People v. Raley, supra,* 2 Cal.4th at p. 919; *People v. Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127].) Defendant's remaining claims, that the death penalty law is unconstitutional because the jury is not required to make findings on which factors it is relying upon to impose death, to unanimously agree on applicable aggravating factors, or to find death appropriate beyond a reasonable doubt, have likewise each been considered and rejected by this court in previous cases. (See, e.g., *People v. Hughes* (2002) 27 Cal.4th 287, 404-406 [27 Cal.4th 825a, 116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Weaver* (2001) 26 Cal.4th 876, 991-993 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

### 2. *Factor (b) aggravating evidence*

Defendant challenges several aspects of the penalty phase instructions and arguments related to section 190.3, factor (b) ("The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."). Three instances of criminal activity involving the use or attempted use of force or violence or the express or implied threat to use force or violence were introduced in aggravation of penalty under factor (b). These were:

"(1) Possession of a Deadly Weapon in a Jail, to wit: razor blades, on April 26, 1990, in violation of Penal Code section 4574;

"(2) Threatening an Executive Officer, to wit: Deputy Shafia, on April 26, 1990, in violation of Penal Code section 69;

"(3) Assault with a Deadly Weapon, to wit: a vehicle, on February 14, 1984, in violation of Penal Code section 245. . . ."

 Defendant contends there was no evidence that the razor blades he possessed in jail were dangerous weapons, or that he used or threatened the use of force in connection with possessing them. He argues that "as a matter of law" his possession of the razor blades could not constitute a violation of section 4574 or properly serve as evidence in aggravation under section 190.3, factor (b). He is wrong on both scores.

Section 4574 provides, in pertinent part, "any person who, while lawfully confined in a jail . . . possesses therein any . . . deadly weapon, . . . is guilty of a felony. . . ." Deputy Shafia testified that during a search of defendant's jail cell on April 26, 1990, six loose razor blades, and two additional safety razor heads containing blades, were found "located throughout his cell, randomly placed." Deputy Shafia testified inmates are allowed to keep up to two safety razors in their cells for shaving, that the jail rules do not allow them to take apart the safety razors or remove the blades, and that homemade "slashing" weapons are commonly constructed by removing such blades and melting them into a plastic toothbrush handle or similar object. Deputy Shafia testified further that defendant appeared upset that the search was being undertaken, and "right in the middle of it" defendant stated to him, in an angry voice, "I'm going to get the gas chamber and before I leave here I'm going to take out a deputy."

The evidence that defendant possessed numerous razor blades that had been removed from safety razors in the manner commonly used to construct jailhouse weapons, and placed "randomly" throughout his cell, all in contravention of jailhouse rules, constituted a violation of section 4574. Although defendant was not observed using the razor blades as deadly weapons, his possession of the blades and their placement throughout the cell (supportive of inferences that defendant wanted to be able to gain easy access to the blades from anywhere in his cell, or alternatively, that if his cell was searched it would be less likely that all the blades would be found) was sufficient to support an inference that they were being possessed for use as deadly weapons. Defendant's assertion that there was no direct evidence he actually intended to "manufacture a weapon" (i.e., affix handles to the

blades) does not undermine our conclusion that a violation of section 4574 was demonstrated.

Defendant's possession of the razor blades for use as deadly weapons was validly considered as evidence in aggravation under section 190.3, factor (b), as it constituted "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (See *People v. Tuilaepa* (1992) 4 Cal.4th 569, 589 [15 Cal.Rptr.2d 382, 842 P.2d 1142] ["a defendant's knowing possession of a potentially dangerous weapon [here, loose razor blades] in custody is admissible under factor (b)"].) The circumstance that defendant voiced a threat to "take out" Deputy Shafia or another jailhouse deputy while the search was underway further serves to characterize defendant's possession of the contraband as an implied threat to use force or violence.

Defendant further contends that as a matter of law his threat voiced to Deputy Shafia could not constitute a violation of section 69 or properly serve as evidence in aggravation under section 190.3, factor (b). Again, he is mistaken.

Section 69, in pertinent part, proscribes "attempts, by means of any threat or violence, to deter or prevent any executive officer from performing any duty imposed upon such officer by law . . . in the performance of his duty . . . ." Deputy Shafia testified defendant was upset that the search of his cell was being undertaken, and "right in the middle of it" defendant stated to him, in an angry voice, "I'm going to get the gas chamber and before I leave here I'm going to take out a deputy."

Deputy Shafia was an executive officer within the meaning of section 69, and to the extent his official duties included overseeing the custody and control of defendant and his fellow inmates, a threat to kill a deputy constituted an attempt to deter or prevent Deputy Shafia from performing his official duties. In any event, we agree with respondent that, "In the factual context in which the threat was made by [defendant], it is reasonable to infer [defendant's] threat to kill a deputy was made with the intent to deter or prevent Deputies Shafia and Spencer from performing their duties related to the search." The fact that Deputy Shafia testified he did not take the threat personally does not undermine this conclusion—a violation of section 69 does not require a showing of the state of mind of the recipient of the threat. (Cf. § 71 [threatening public employees and officers and school officials]; see *People v. Tuilaepa, supra,* 4 Cal.4th at p. 590.)

Defendant observes that a violation of section 69 requires a specific intent to interfere with the executive officer's performance of his duties (see

*People v. Patino* (1979) 95 Cal.App.3d 11, 27 [156 Cal.Rptr. 815]), and that the jury was not so instructed. Although specific instruction on the elements of other crimes introduced in aggravation under section 190.3, factor (b) is generally not required (see *People v. Osband* (1996) 13 Cal.4th 622, 711 [55 Cal.Rptr.2d 26, 919 P.2d 640]), here the jury was instructed, through the language of CALJIC No. 3.30 (concurrence of act and general criminal intent), that general criminal intent was required for the crime of threatening an executive officer within the meaning of section 69. The error, however, was clearly harmless beyond a reasonable doubt. There was evidence that defendant harbored the requisite specific intent. Under the factual circumstances in which the threat was made ("right in the middle" of the search, and in an angry tone of voice), it is reasonable to infer the threat was intended to deter or prevent Deputy Shafia and his partner from performing their duties related to the ongoing search of defendant's cell. That evidence notwithstanding, given defendant's attempted murder of Officer Dunavent by placing a gun to his head and pulling the trigger, and his prior conviction of assault with a deadly weapon on a peace officer in 1984, any misinstruction on the intent element of a violation of section 69 in connection with factor (b) was clearly harmless.

Last, defendant contends the trial court erroneously allowed "double-counting" of evidence of his 1984 prior conviction of assault with a deadly weapon (vehicle) on a peace officer under section 190.3, factors (b) and (c). We have, however, in many past cases held that such double-counting is generally permissible, as each factor has a separate purpose. (See, e.g., *People v. Kelly* (1992) 1 Cal.4th 495, 549 [3 Cal.Rptr.2d 677, 822 P.2d 385]; *People v. Price, supra,* 1 Cal.4th at p. 472; *People v. Fierro* (1991) 1 Cal.4th 173, 230 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People v. Melton* (1988) 44 Cal.3d 713, 764 [244 Cal.Rptr. 867, 750 P.2d 741].) Moreover, there is no merit to defendant's claim that the manner in which evidence of the prior conviction and evidence of the facts of the crime underlying the prior conviction was presented to the jury caused them to believe that evidence of two separate assault crimes was being offered in aggravation. It is true that the prosecutor asked the court to instruct on the elements of assault with a deadly weapon generally, rather than assault with a deadly weapon on a peace officer, apparently for the purpose of avoiding undue confusion. However, the prosecution and defense twice stipulated at trial to the fact of the prior conviction, and the evidence presented at the penalty phase made it abundantly clear that the prior assault with a deadly weapon conviction to which defendant stipulated was based on the same assault with a deadly weapon on a peace officer in 1984, about which further factual evidence was being presented under factor (b).

### 3. *Prosecutorial misconduct (penalty phase)*

We have already rejected defendant's claim that the prosecutor committed misconduct in his cross-examination of several defense witnesses, including defendant himself, at the guilt phase. Defendant also argues that the prosecutor committed misconduct in his arguments to the jury at the penalty phase. Defendant, however, made no objection at any point during the prosecutor's penalty phase arguments. Accordingly, he has waived any claim of prosecutorial misconduct on appeal. (*People v. Osband, supra,* 13 Cal.4th at p. 717.) Nor was defense counsel ineffective for failing to raise any objections since, as next explained, the prosecutor's arguments complained of, for the first time on appeal, were proper statements of the law and fair comment on the evidence.

Defendant first argues the prosecutor misled the jury about the scope and nature of section 190.3, factor (a) by implying that factor (a) evidence could only be aggravating and not mitigating. A review of the prosecutor's argument regarding factor (a) reveals the prosecutor did not tell the jury, expressly or implicitly, that factor (a) evidence could never be mitigating, but only that the evidence of the crimes in this case was overwhelmingly aggravating. The prosecutor emphasized that defendant committed two murders and a kidnapping, aided and abetted his 15-year-old son in the rape of his second wife, and attempted to kill a police officer to avoid arrest. He argued that Jones's murder by slow strangulation with a garrote applied from behind was "a slow agonizing way of killing a person," which reflected "a particular extreme type of depravity, an abandonment of human values," as did defendant's determination to involve his 15-year-old son in the planned crime spree. We deem these fair comment on the evidence under factor (a), and not misconduct.

Defendant claims the prosecutor misstated the law in his argument to the jury regarding section 190.3, factors (e), (f), (g), and (j). He urges, "a reasonable juror would conclude that if the evidence did not show factors (e), (f), (g), and (j) to exist as mitigation, as the prosecutor stated, those factors must aggravate, as the prosecutor intended to imply." A close reading of this claim reveals defendant is merely restating his belief, in the context of a challenge to the prosecutor's arguments, that the law *should* require the various penalty factors under section 190.3 to be specifically defined for the jury as aggravating or mitigating. As we have explained, that is not the law. (See *ante,* at p. 1151; *People v. Mayfield, supra,* 14 Cal.4th at p. 806; *People v. Raley, supra,* 2 Cal.4th at p. 919.) In each instance complained of, the prosecutor simply urged the jury to find there was no mitigating evidence under any of the four factors. Thus, the prosecutor argued the murder victims

were not participants in defendant's homicidal conduct, nor did they consent to their own homicides (factor (e)); that defendant's crimes were not committed under circumstances which he reasonably believed to be a moral justification or extenuation for his conduct (factor (f)); that defendant did not act under extreme duress or under the substantial domination of another person (factor (g)); and that defendant was not an accomplice to the murders (with the exception of the rape of Rose V.), nor was his participation in their commission relatively minor (factor (j)).

The prosecutor did not affirmatively tell the jury that the absence of mitigating evidence under any of these factors meant the factors should be viewed or counted as aggravating. As we explained in *People v. Berryman, supra,* 6 Cal.4th at page 1095, "A reasonable juror would have understood and employed the language to mean nothing more objectionable than the tautology that the absence of mitigation is the absence of mitigation." Defendant acknowledges our observation in *Berryman* but urges it is illogical and wrong. We decline his invitation to reconsider it.

Defendant also contends the prosecutor improperly argued to the jury that his kidnapping of Rose V. and his attempt to murder Officer Dunavent were aggravating "circumstances of the crime" under section 190.3, factor (a). Defendant essentially reasserts his claim that factor (a) is unconstitutionally vague because "the jury is given no guidance regarding the time and space components of the 'circumstances' of the crime." We reject defendant's suggestion that his kidnapping of Rose V. and his attempted murder of Officer Dunavent were not relevant and admissible under factor (a). The jury convicted him of those crimes as well as the two murders, and they were patently part of the "circumstances of the crime" (factor (a)) that the jury was entitled to consider in deliberation of penalty.

Finally, we reject defendant's further argument that the prosecutor improperly sought "to bolster a weak, circumstantial case" by telling the jury defendant killed Jones for her van and to silence her because she knew of his plans. Defendant's use of the van to carry out his murderous plans was itself circumstantial evidence of his motive to kill Jones. His assertion on appeal that there was no evidence to support the prosecutor's argument that he may have killed Jones to silence her because she knew of his criminal plans is belied by his own trial testimony: he testified he had told Jones the entire truth about his plans. Moreover, the circumstance that defendant's written notes outlining his criminal intentions were among his personal effects stored in the van, together with his own testimony that his belongings appeared to have been searched when he discovered the van in the motel parking lot on the afternoon of October 31, 1986, supports an inference that

Jones was murdered when she learned of defendant's true intentions. However Jones may have learned of defendant's criminal plans, the prosecutor's argument that defendant killed her to silence her was fair comment on the evidence and not misconduct.

### 4. *Ineffective assistance of counsel (penalty phase)*

We have rejected defendant's guilt phase claim that the trial court erred in excluding third party culpability evidence regarding the murder of Jones. (*Ante*, at pp. 1134-1137.) Defendant argues further that defense counsel rendered ineffective assistance by failing to pursue the admission of third party culpability evidence at the penalty phase as mitigating evidence. We do not agree.

In order to establish ineffective assistance of counsel, a defendant must first show that his or her counsel's performance was "deficient" because counsel's "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [104 S.Ct. 2052, 2064-2065, 80 L.Ed.2d 674]; *People v. Weaver, supra,* 26 Cal.4th at p. 925.) Second, the defendant must demonstrate prejudice flowing from counsel's act or omission—i.e., a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*In re Sixto* (1989) 48 Cal.3d 1247, 1257 [259 Cal.Rptr. 491, 774 P.2d 164], citing *Strickland, supra,* 466 U.S. at p. 694 [104 S.Ct. at p. 2068].) "Finally, it must also be shown that the [act or] omission was not attributable to a tactical decision which a reasonably competent, experienced criminal defense attorney would make." (*In re Sixto, supra,* at p. 1257.)

Contrary to defendant's assertion, we conclude defense counsel was not ineffective in failing to seek to introduce third party culpability evidence in mitigation at the penalty phase. First, to the extent the defense did present evidence at the guilt phase regarding the failed drug transaction involving Jones, defendant, and a person named Pablo, all such evidence by stipulation was available for consideration by the jury at the penalty phase. This included defendant's testimony that Jones supposedly owed a large debt related to a drug transaction, that she had been threatened by her drug suppliers, and that she had enlisted the services of defendant to protect her. In any case, given that the jury at the guilt phase had plainly rejected defendant's claim that he was uninvolved in Jones's murder by convicting him of the murder, defense counsel had an obvious tactical reason for refraining from once again urging the jury at the penalty phase to find that

Pablo or some other third party had killed Jones. It is not reasonably probable that defense counsel's determination not to pursue the theme of third party culpability for Jones's murder with any more vigor at the penalty phase prejudiced the penalty verdict. (*Strickland v. Washington, supra,* 466 U.S. 668, 690-691 [104 S.Ct. 2052, 2065-2067].)

### 5. *Evidentiary ruling: cross-examination of expert witness*

 Defendant contends a ruling by the trial court improperly permitted the prosecutor to cross-examine defense expert Jerry Enomoto, a former Director of the Department of Corrections, with police reports of defendant's prior arrest incidents (furnished to the defense through discovery) which, defendant argues, were inadmissible hearsay. The reports recounted two arrests in 1975 and one in 1979 during which defendant was drunk and verbally threatened officers, or fled and had to be forcibly taken into custody.

"It is common practice to challenge an expert by inquiring in good faith about relevant information, including hearsay, which he may have over-looked or ignored." (*People v. Montiel* (1993) 5 Cal.4th 877, 924 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) The short answer to defendant's contention is that there was no objection and, accordingly, any claim of error has been waived on appeal. (*People v. Clark* (1993) 5 Cal.4th 950, 1014 [22 Cal.Rptr.2d 689, 857 P.2d 1099] [failure to object to prosecutor's references to jailhouse reports].) In any event, the record reflects the defense expressly agreed to a procedure whereby the prosecutor and defense counsel were afforded an opportunity to review the materials (which had been furnished to the defense through discovery, and which counsel had apparently failed to provide to his witness) in preparation for Enomoto's cross-examination. Then, during a second recess, defense counsel, Enomoto, and defendant were afforded an opportunity to discuss the witness's testimony, with defendant expressly agreeing to the strategy being utilized. Finally, the jury was specially instructed that the reports in question were to be considered only for the purpose of determining the weight to be given Enomoto's testimony, and not for the truth of the matters regarding defendant's prior conduct reflected in the reports. Even were the reports improperly considered for their content, the jury had already found defendant guilty of attempting to kill Officer Dunavent in the guilt phase and knew he had previously been convicted of aggravated assault on a police officer. There was neither error nor prejudice.

### 6. *Instructions pertaining to penalty phase deliberations*

 Defendant contends it was error for the trial court to refuse certain of his specially proposed penalty phase instructions. We find no error respecting any of the individual claims.

First, the trial court properly rejected defendant's specially proposed instruction that would have listed the evidence he viewed as mitigating. The instruction was patently argumentative and, among other things, would have usurped the jury's proper role as fact finder at the penalty phase.[12] A capital defendant is not entitled to unduly argumentative instructions in the penalty phase. (See *People v. Ashmus* (1991) 54 Cal.3d 932, 1003-1004 [2 Cal.Rptr.2d 112, 820 P.2d 214].) Although instructions pinpointing the *theory* of the defense might be appropriate, a defendant is not entitled to instructions that simply recite facts favorable to him. (See *People v. Benson* (1990) 52 Cal.3d 754, 805-806 [276 Cal.Rptr. 827, 802 P.2d 330].)

Next, defendant argues the court erred in refusing his specially proposed instruction that would have told the jury that life without the possibility of parole means "defendant will be imprisoned for the rest of his life," and that imposition of the death penalty means "defendant will be executed." Although the court initially indicated it would consider giving the instruction, thereafter the court determined to reject the instruction but permit counsel to argue its substance before the jury. This ruling was correct. In *People v. Thompson* (1988) 45 Cal.3d 86 [246 Cal.Rptr. 245, 753 P.2d 37], we upheld the rejection of a similarly worded instruction, finding it inaccurate and prone to inviting speculation. (*Id.* at pp. 130-131; see also *People v. Padilla* (1995) 11 Cal.4th 891, 971-972 [47 Cal.Rptr.2d 426, 906 P.2d 388]; *People v. Sanders* (1995) 11 Cal.4th 475, 561-562 [46 Cal.Rptr.2d 751, 905 P.2d 420] [trial court not required to instruct that life without possibility of parole means just that].) *Thompson* further indicated that counsel's proper argument to the jury characterizing the full nature of a sentence of life in prison

---

[12]The proposed instruction read as follows:

"Evidence has been introduced showing the defendant, Isaac Gutierrez, Jr., was a caring human being by coming to the aid of 61 year old Lawrence Biedeback while being assaulted; helped save the life of Annabelle Hood's three year old daughter; and voluntarily sought treatment at the V.A. Hospital to correct his alcohol problem. Evidence also showed that Mr. Gutierrez worked hard to advance his 14 year career as a Fireman only to be victimized by discrimination and wrongfully terminated; was responding productively and positively to prison life when he was emotionally devastated by [Rose V.'s] surprise notice that she was abandoning him; experienced unbearable frustration when he asked the courts to help resolve a custody and property dispute, but was turned away; reacted with paralyzing panic as he watched somebody named John Stopher come from nowhere to take control of defendant's home and defendant's daughter; became irrationally obsessed with rage and hopelessness when he killed John Stopher; demonstrated spontaneous remorse at JFK Hospital and a serene remorse in a letter he wrote to his mother. [¶] Evidence was introduced showing Mr. Gutierrez can function and be productive within the prison system for the rest of his life. [¶] The evidence was not offered as a legal excuse for the crimes. [¶] The evidence was solely offered to show circumstances extenuating (that is, 'mitigating') the gravity of the crimes and explaining the reasons for defendant's behavior. [¶] If you are satisfied these circumstances mitigate the gravity of the crimes and are not substantially outweighed by the factors in aggravation, then you may impose a sentence of Life Without Possibility of Parole."

without the possibility of parole was permissible. (*People v. Thompson, supra,* 45 Cal.3d at p. 131, fn. 29.)

The trial court also refused defendant's specially proposed instruction that would have told the jury, "If you have a reasonable doubt as to which penalty to impose, death or life in prison without the possibility of parole, you must give the defendant the benefit of that doubt and return a verdict fixing the penalty at life in prison without the possibility of parole." Defendant would next have us assign error to the court's refusal to give the instruction, but it was properly refused as it was patently wrong. " '[W]e have consistently rejected the contention that the beyond-a-reasonable-doubt standard applies to the process of penalty determination . . . .' " (*People v. Berryman, supra,* 6 Cal.4th at p. 1101; see also *People v. Mayfield, supra,* 14 Cal.4th at p. 806; *People v. Jackson, supra,* 13 Cal.4th at p. 1244; *People v. Medina* (1995) 11 Cal.4th 694, 782 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

■ Defendant next argues it was error to refuse his specially proposed instruction that would have told the jury, "You are instructed that nothing I have said requires you to reach a verdict of which penalty to impose. [¶] The possibility of a hung jury is an inevitable by-product of the requirement that a verdict must be unanimous." The ruling was correct. "[T]here is no duty to instruct a jury regarding its possible failure to reach a [penalty] verdict in the absence of a request by the jury for an explanation." (*People v. Wader, supra,* 5 Cal.4th at p. 664; see also *People v. Morris* (1991) 53 Cal.3d 152, 227 [279 Cal.Rptr. 720, 807 P.2d 949]; *People v. Miranda, supra,* 44 Cal.3d at p. 105.)

Defendant proposed a special "Concluding Instruction" that he would have substituted for the standard instruction defining the weighing process, CALJIC No. 8.88.[13] He now argues it was error to refuse the instruction because it was necessary to advise the jury that the result of the weighing process had to be a *reasoned decision* as to penalty, and that a single mitigating factor could be sufficient to reject the penalty of death.

---

[13]The proposed instruction read as follows:

"After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances and that the imposition of the death penalty in this case is justified and appropriate, you may impose a sentence of death. [¶] To return a death judgment, you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating evidence that it warrants death instead of life imprisonment without the possibility of parole. [¶] The weighing process is not mathematical or mechanic, but a means to reach a reasoned decision about the appropriate penalty. [¶] You are free to reject the death penalty in this case if you decide, based on any evidence presented, that it is not the appropriate punishment."

There was no error. Nothing in the standard weighing instruction suggested to the jury that it could make an arbitrary decision as to penalty, as opposed to a "reasoned decision." To the contrary, CALJIC No. 8.88 expressly instructed the jury to "consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances," and further cautioned the jury not to engage in a "mere mechanical counting of factors." Nor was there any need to specially instruct the jury on the appropriate process of weighing mitigating factors. In this regard, CALJIC No. 8.88 properly advised the jury that "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." As we have explained, CALJIC No. 8.88 properly describes the weighing process as " 'merely a metaphor for the juror's personal determination that death is the appropriate penalty under all of the circumstances.' " (*People v. Jackson, supra,* 13 Cal.4th at p. 1244, quoting *People v. Johnson* (1992) 3 Cal.4th 1183, 1250 [14 Cal.Rptr.2d 702, 842 P.2d 1].)

Last, defendant contends the trial court should have given CALJIC No. 2.83, pertaining to the resolution of conflicting expert witness testimony, at the penalty phase. The request was properly refused on the ground that no conflicting expert testimony was presented at the penalty phase. Moreover, CALJIC No. 2.83 was given at the guilt phase and there was no need to reread it at the penalty phase. (See, e.g., *People v. Sanders, supra,* 11 Cal.4th at p. 561 [no need to reread generic instructions at penalty phase that were given at guilt phase and did not conflict with penalty phase instructions]; *People v. Danielson* (1992) 3 Cal.4th 691, 723 [13 Cal.Rptr.2d 1, 838 P.2d 729]; *People v. Wharton, supra,* 53 Cal.3d at p. 600.)

7. *Two-week suspension of penalty phase deliberations*

The jury was sworn to hear this case on June 18, 1990, and opening statements commenced that same day. The record reflects that on that date the trial judge advised counsel and the jury that he would be unavailable for trial during the last week in August 1990. Trial lasted through the summer. In addition to the court's scheduling a one-week vacation for the last week of summer, the record reflects that four of the 12 seated jurors, and two of the four alternates, had prearranged to take their vacations during that same last week of summer.

The jury commenced penalty deliberations on Monday, August 20, 1990. The jury requested a readback of certain testimony on Wednesday, August 22, 1990. Late in the afternoon of the following day, Thursday, August 23,

1990, with deliberations yet to produce a penalty verdict, the court adjourned the trial proceedings for a 13-day period, with the jurors ordered to return Wednesday, September 5, 1990. *Critically, defendant and his counsel expressly agreed to the arrangement.* Moreover, the trial judge indicated he had arranged for deliberations to continue in his absence without recess before another judge of the superior court bench who had agreed to fill in. Defendant and his counsel declined that option, preferring instead to adjourn the proceedings until the first week of September.

Thereafter, on Friday, August 31, 1990, San Bernardino County Superior Court Judge Robert Krug extended the recess one day, to Thursday, September 6, 1990, because one juror would be unavailable until that date due to a death in the family. On Tuesday, September 4, 1990, at a specially called hearing before the trial judge, the Honorable Ben T. Kayashima, who had returned, defendant and counsel expressly agreed to the one-day extension and declined an invitation to have an alternate juror seated to replace the juror who had to attend a funeral. All in all, the recess spanned 13 calendar days (eight court days), given the two intervening weekends and the Labor Day holiday on Monday, September 3, 1990.

 Defendant urges us to find error in the eight-court-day (13-calendar-day) recess. Defendant, however, is precluded from claiming error as he and his counsel expressly agreed to the recess arrangement and further expressly declined the court's invitation to continue deliberations uninterrupted before a substitute trial judge. (See, e.g., *People v. Johnson* (1993) 19 Cal.App.4th 778, 791-794 [23 Cal.Rptr.2d 703] [defendant's failure to object to 17-day recess of jury deliberations for Christmas holiday break waived any claim of error]; *People v. Harris* (1977) 73 Cal.App.3d 76, 86 [140 Cal.Rptr. 697] [failure to object to five-day recess of jury deliberations waived assignment of error on appeal].) Nor has defendant demonstrated prejudice from the mutually agreed upon adjournment of proceedings. His claim that the jury's penalty verdict, returned on the same date court proceedings were reconvened, was the direct and prejudicial result of the recess, is none other than speculation.

### 8. *Calculation of determinate sentence*

 Defendant raises several challenges to the 25-year aggregate determinate term he received in addition to the death penalty. We consider each in turn, finding only one has merit.

First, the trial court imposed four 2-year firearm-use enhancements (§ 12022.5) under counts II (murder of Stopher), III (burglary), IV (kidnapping of V.), and VII (attempted murder of Officer Dunavent). At the time of

the offenses, the rule of *In re Culbreth* (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23] applied.[14] The rule provided that even if there were multiple counts involving multiple victims of violent crime, a section 12022.5 enhancement could be imposed only once "if all the charged offenses are incident to one objective and effectively comprise an indivisible transaction . . . ." (*Culbreth*, at p. 333.) Since the trial court stayed imposition of the firearm-use enhancements under counts III (burglary) and IV (kidnapping), the court pragmatically complied with *Culbreth* respecting those counts. (See *People v. Rosalez* (1979) 89 Cal.App.3d 789-794 [153 Cal.Rptr. 65] [*Culbreth* error harmless where enhancements run concurrently].) Hence, even were we to find *Culbreth* error respecting those counts, no modification of the judgment would be required.

In contrast, the two section 12022.5 enhancements under counts II (murder) and VII (attempted murder) were ordered to be served consecutively. Accordingly, we must determine whether imposition of both enhancements violated *Culbreth*. It did not. The murder of Stopher and the attempted murder of Officer Dunavent occurred hours apart. Defendant had ample time to reflect on his conduct between the two offenses, and he manifestly killed Stopher, and attempted to kill Officer Dunavent, for entirely different purposes. Accordingly, "[t]he court could properly find no 'indivisible transaction' barring imposition of separate weapon enhancements." (*People v. Pride* (1992) 3 Cal.4th 195, 269 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

■ There is no merit to defendant's further claims that sentencing him on the burglary count in addition to terms for the rape and kidnapping convictions constituted double punishment in violation of section 654, or that the trial court gave inadequate reasons for imposing a full, consecutive term for the forcible rape conviction pursuant to section 667.6, subdivision (c). However, there is merit to defendant's argument that the court improperly imposed three separate five-year enhancements for his prior felony conviction of assault with a deadly weapon (vehicle) on a peace officer, pursuant to section 667, subdivision (a). The record reflects that section 667, subdivision (a) enhancements were imposed under count I (Jones murder), imposed and stayed under count VII (attempted murder of Officer Dunavent), and imposed on counts III (rape) and IV (burglary) but ordered to be served concurrently under those counts. Although, as a practical matter, defendant's 25-year aggregate determinate prison sentence thus included only one 5-year enhancement added into the calculation, only one section 667, subdivision (a) enhancement should have been imposed in

---

[14]*Culbreth* was subsequently overruled in *People v. King* (1993) 5 Cal.4th 59, 79 [19 Cal.Rptr.2d 233, 851 P.2d 27], but the holding in *King* was made prospective only. (*Id.* at pp. 79-80.)

connection with the aggregate sentence. (See *People v. Tassell* (1984) 36 Cal.3d 77, 91 [201 Cal.Rptr. 567, 679 P.2d 1].) Accordingly, we shall order the section 667, subdivision (a) enhancements under counts III, IV, and VII stricken, and the abstract of judgment amended to reflect only one such enhancement imposed under count I.

### 9. *Cumulative effect of penalty phase errors*

Defendant contends that the cumulative effect of the penalty phase errors requires reversal. (See, e.g., *People v. Hill, supra,* 17 Cal.4th at pp. 844-845.) We have, however, found no appreciable error at the penalty phase, with the exception of the improper instruction on the requisite intent element regarding the threat to Deputy Shafia, an executive officer (§ 69), admitted in the prosecution's case in aggravation, which error we have found clearly harmless. (See *ante,* at p. 1154.) Accordingly, there is no cumulative effect of penalty phase errors in this case.

### 10. *Disproportionality of sentence*

 Finally, defendant urges that his punishment is disproportionate to his individual culpability. We cannot agree. We have evaluated "whether [defendant's] capital sentence is so 'grossly disproportionate' to the offense as to constitute cruel or unusual punishment under article I, section 17 of the California Constitution." (*People v. Arias* (1996) 13 Cal.4th 92, 193 [51 Cal.Rptr.2d 770, 913 P.2d 980].) A death sentence is grossly disproportionate if it "shocks the conscience and offends fundamental notions of human dignity." (*People v. Livaditis* (1992) 2 Cal.4th 759, 786 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

The evidence in this case established that defendant murdered his friend, Billie Faye Jones, by strangling her from behind with a garrote he made. He then took her van, with her body secreted in the vehicle and the garrote still wrapped around her neck, and proceeded to Hesperia after enlisting the assistance of his 15-year-old son in his plan to do harm to Stopher and Rose V. He gained entry into Rose V.'s home by ruse, murdered Stopher in the shower with shotgun blasts to the face, head and torso, kidnapped Rose V., aided and abetted his minor son in raping her during her abduction, and upon being stopped by police with both his kidnapped victim and murdered victim in the van, attempted to murder Officer Dunavent by placing a gun to his head and pulling the trigger. Two years earlier, defendant had been convicted of assault with a deadly weapon on a peace officer when he tried to run over several officers with his car after leading them on a high-speed chase. We conclude imposition of the death penalty in this case is not so

disproportionate to defendant's individual culpability for these crimes that it "shocks the conscience and offends fundamental notions of human dignity." (*People v. Livaditas, supra,* 2 Cal.4th at p. 786.)

### III. CONCLUSION

The abstract of judgment is ordered amended to reflect imposition of one section 667, subdivision (a) enhancement under count I. In all other respects the judgment is affirmed in its entirety.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied October 2, 2002, and the opinion was modified to read as printed above.